STATE of Wisconsin EX REL. NEWSPAPERS, INC., a Wisconsin corporation, and Karen S. Rothe, Plaintiffs-Appellants. †

v.

Dean A. SHOWERS, Edwin J. Laszewski, Jr., Mary M. Wilkinson and Theodore J. Fadrow, Defendants-Respondents.

Court of Appeals

*No. 85–0471. Submitted on briefs August 15, 1985. Oral argument September 11, 1985.—Decided December 4, 1985.*
(Also reported in 382 N.W.2d 60.)

† Petition to review granted.

152

153

For the plaintiffs-appellants the cause was submitted on the briefs of *Meissner, Tierney, Ehlinger & Whipp, S.C.* by *Dennis L. Fisher* and orally argued by *Dennis L. Fisher,* of Milwaukee.

For the defendants-respondents the cause was submitted on the briefs of *Michael J. McCabe* by *Patrick Halligan* and orally argued by *Patrick Halligan,* of Milwaukee.

Before Moser, P.J., Wedemeyer and Sullivan, JJ.

WEDEMEYER, J.  Newspapers, Inc. and Karen S. Rothe (Newspapers) appeal from a judgment denying their motions for summary judgment and granting summary judgment to four members of the Milwaukee Metropolitan Sewerage Commission: Dean A. Showers, Edwin J. Laszewski, Jr., Mary M. Wilkinson and Theodore J. Fadrow (commissioners). Newspapers asserts trial court error in interpreting the open meetings law, secs. 19.81–19.98, Stats. Because under the facts of this case we conclude that the legislature did not intend the gathering of the four commissioners on December 1, 1983, (after the adjournment of a regular meeting) to be a "meeting" under the law, we affirm.

The undisputed facts contained in the record reveal the following. The Milwaukee Metropolitan Sewerage Commission, pursuant to secs. 66.88–66.918, Stats., is the governing body of the Milwaukee Metropolitan Sewerage District. It consists of eleven members; seven representing the city of Milwaukee and four representing the included suburbs.[1] In conducting its business of designing, constructing, maintaining and operating the sewerage system within the district, it holds public meetings. Each year the commission has the duty to adopt both an operating budget and a capital budget. Generally, a two-thirds vote of the total membership of the commission (or eight members) is required to pass any financing measure. Sec. 66.886(2)(a)1.

In late 1983, a pressing issue arose as to which method of funding was to be utilized for the 1984 budget year. Until December, proposed plans to finance the budget had been uniformly rejected, with the suburban commissioners voting against the Milwaukee commissioners' proposals and vice versa. To exacerbate this impasse, tax bills were to be mailed to the residents of some of the suburban municipalities in the district by early December, 1983. Not to include a charge for sewerage service would pose additional problems, so the commission met four times during the week of November 28—December 2 in an effort to establish a tax levy and thereby meet the mailing deadline. During these meetings, suburban commissioners Fadrow and Wilkinson offered resolutions to finance the capital budget, as did city commissioner Laszewski. All of

---

[1] At all times relevant to this controversy, one of the city seats was vacant.

these resolutions failed to obtain the necessary two-thirds majority vote.

December 1, after a regular meeting of the commission, these three commissioners, along with chairperson Showers, a city appointee, met privately for about an hour to discuss the impasse. It is not clear from the record how these four individuals happened to attend the meeting or how the meeting was organized. It is uncontroverted, however, that the general purpose of the meeting was to discuss governmental business. The next day, at a scheduled meeting of the commission, upon a resolution offered by Laszewski and seconded by Wilkinson, a tax levy was enacted by a vote of nine to one.

Newspapers filed a declaratory judgment action alleging that the four commissioners violated the open meetings law, secs. 19.81–19.98, Stats. On the basis of the undisputed facts recounted above, both sides moved for summary judgment. The trial court, in concluding that the meeting of the four commissioners was not a "meeting" as defined in the open meetings law, based its decision on a combination of factors: the absence of corporate capacity to conduct business, spend money or establish policy; the lack of a quorum; and the failure to meet the two-prong balancing of interests test set forth in sec. 19.81(1). Newspapers appeals.

Interpretation of a statute is a question of law which we review without deference to the trial court. *Town of Seymour v. City of Eau Claire,* 112 Wis. 2d 313, 319, 332 N.W.2d 821, 823 (Ct.App. 1983). Newspapers contends that the gathering of the four commissioners to discuss issues immediately pending before the commission constitutes a "meeting" under sec. 19.82(1) and

(2), Stats. To support this contention it advances four arguments:

(1)   The plain language of the statute clearly covers meetings of less than a quorum;

(2)   If there is ambiguity in the statutory definition of "meeting", then the legislative history indicates that the statute was designed to reach a gathering of less than a quorum;

(3)   A construction which fosters the purpose of the statute is to be favored over a construction which would defeat the manifest object of the statute; and

(4)   The closed meeting on December 1 is subject to the open meetings law because it constituted a "negative quorum."

We shall examine these arguments *seriatim.*

## THE "PLAIN MEANING" OF THE OPEN MEETINGS LAW

First, Newspapers asserts that the statutory language clearly includes gatherings of less than a quorum. The primary purpose of statutory interpretation is to determine and give effect to legislative intent. *Ball v. District No. 4 Area Board,* 117 Wis. 2d 529, 537–38, 345 N.W.2d 389, 394 (1984). To achieve this task, we initially examine the language of the statute itself. If the meaning of the statute is clear on its face, this court will not look outside the statute in applying it. *Id.* at 538, 345 N.W.2d at 394.

"[W]hether . . . the words of a statute are clear is itself not always clear." N. Singer, 2A *Sutherland on*

*Statutes and Statutory Construction* § 46.04 at 86 (Sands rev. 4th ed. 1984) (footnote omitted). Our supreme court has held that a statute, or any sentence, clause or word thereof, is ambiguous only when it is capable of being understood by reasonably well-informed persons in either of two or more senses. The test is whether well-informed persons could have been confused. *Department of Revenue v. Nagle-Hart, Inc.,* 70 Wis. 2d 224, 227, 234 N.W.2d 350, 352 (1975) (citations omitted). "An ambiguity can be created by the interaction of two separate statutes as well as by the interaction of the various words and the structure of the statute itself." *Morrissette v. DeZonia,* 63 Wis. 2d 429, 436, 217 N.W.2d 377, 381 (1974).

Wisconsin's open meetings law provides in relevant part:

## OPEN MEETINGS OF
## GOVERNMENTAL BODIES

**19.81 Declaration of policy.** **(1)** In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business.

**(2)** To implement and ensure the public policy herein expressed, all meetings of all state and local governmental bodies shall be publicly held in places reasonably accessible to members of the public and shall be open to all citizens at all times unless otherwise expressly provided by law.

. . . .

**(4)** This subchapter shall be liberally construed to achieve the purposes set forth in this section, and the rule that penal statutes must be strictly construed shall be limited to the enforcement of forfeitures and shall not otherwise apply to actions brought under this subchapter or to interpretations thereof.

**19.82 Definitions.** As used in this subchapter:

**(1)** "Governmental body" means a state or local agency, board, commission, committee, council, department or public body corporate and politic created by constitution, statute, ordinance, rule or order; a governmental or quasigovernmental corporation; or a formally constituted subunit of any of the foregoing . . .

**(2)** "Meeting" means the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. If one-half or more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. The term does not include any social or chance gathering or conference which is not intended to avoid this subchapter.

. . . .

**19.83 Meetings of governmental bodies.** Every meeting of a governmental body shall be preceded by public notice . . . and shall be held in open session. At any meeting of a governmental body, all discussion shall be held and all action of any kind, formal or informal, shall be initiated, deliberated upon and acted upon only in open session except as provided in s. 19.85.

Newspapers argues that this statutory language clearly covers the meeting that occurred on December 1, 1983. In particular, Newspapers focuses on the clause "convening of *members* of a governmental body for the *purpose* of *exercising* the responsibilities . . . or duties delegated to or vested in the body," sec. 19.82(2), Stats. (emphasis added), and argues that one of the responsibilities of public officials is the obligation to discuss the important issues confronting them. To Newspapers, it is irrelevant whether the size of the group is sufficient to make policy decisions. Rather, Newspapers claims that the purpose of exercising responsibility at its lowest level, *i.e.* a discussion by two or more members of any subject matter with which they are legislatively charged, is the paramount concern of the statute. Newspapers further argues that the first sentence of sec. 19.82(2) neither requires a minimum number of attendees nor mandates that members in attendance have the power vested in the total body.

On the other hand, the commissioners argue that the word "meeting," because of its relationship to other words in secs. 19.81 and 19.82, Stats., implies more than just a gathering of two or more members who happen to discuss matters that properly came before the entire body. The commissioners deny that such a gathering can discharge sufficient "responsibilities" to warrant application of the open meetings law. They insist that the group must have the ability to exercise corporate power; that is, the words "convening" members of a governmental body for the purpose of exercising "responsibilities . . . delegated to or vested in" the corporate body, are to be emphasized rather than the individual responsibilities of the members who are constituent parts of the body. Inherent in this ap-

proach is the necessity that corporate capacity and competency be explicit or, at the very least, implicit.

█

From this review of the parties' initial contentions, we conclude that the word "meeting" as used in sec. 19.82(2), Stats., is reasonably susceptible to different interpretations and is therefore ambiguous. Thus, we reject Newspapers' claim that the commissioners' December 1 meeting violated the "plain meaning" of the open meetings law. Because the word "meeting" is ambiguous, we must attempt to construe the word in a way which best serves the legislative intent as revealed by the scope, history, context, subject matter and the object intended to be remedied or accomplished by the statute. *Midland Financial Corporation v. Department of Revenue,* 116 Wis. 2d 40, 49–50, 341 N.W.2d 397, 401 (1983).

## THE LEGISLATIVE HISTORY OF THE OPEN MEETINGS LAW

Newspapers next contends that if there is ambiguity in the statutory definition of the word "meeting," then legislative history demonstrates unequivocally that the legislature did not intend the open meetings law to apply only to gatherings where a quorum is present. Section 66.77, Stats. (1973), the predecessor to secs. 19.81–19.98, Stats., provided in part:

**Open meetings of governmental bodies:** **(1)** In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is

compatible with the conduct of governmental affairs and the transaction of governmental affairs and the transaction of governmental business. *The intent of this section is that the term "meeting" or "session" as used in this section shall not apply to any social or chance gathering or conference not designed to avoid this section.*

**(2)** In this section:

. . . .

(b) *"Meeting" means the convening of a governmental body in a session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members.*

. . . .

(d) "Open session" means a meeting which is held in a place reasonably accessible to members of the public, which is open to all citizens at all times, and which has received public notice.

. . . .

**(3)** Except as provided in sub. (4), all meetings of governmental bodies shall be open sessions. . . . Any action taken at a meeting held in violation of this section shall be voidable. [Emphasis added.]

In *State ex rel. Lynch v. Conta,* 71 Wis. 2d 662, 239 N.W.2d 313 (1976), our supreme court thoroughly examined sec. 66.77, Stats. (1973). The case involved a challenge to two meetings held by the joint committee on finance, a formally constituted subunit of the legislature that consisted of fourteen members: eleven democrats and three republicans. Because the participants at both meetings were all democrats, the supreme court concluded the meetings were "partisan caucuses" exempted under sec. 66.77(4)(g) (*see* present sec. 19.87(3), Stats.). *Id.* at 700, 239 N.W.2d at 337. In ana-

lyzing the second, seven-member meeting, the court considered and rejected a "negative quorum" argument that the seven members could control their absent democratic colleagues and thereby direct the actions of the entire committee. *Id.* at 690, 239 N.W.2d at 333.

In construing the subsection of sec. 66.77(2), Stats. (1973), that defined "meeting," the *Conta* court said:

The rather formal language employed—the "convening . . . in a session," and not just any session, but rather a "session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members"—compels a conclusion that those sessions where the members compose a legally competent governmental body are "meetings" under the statute.

*Id.* at 682, 239 N.W.2d at 329. It concluded that when the members bring the governmental body to its collective existence, there must be compliance with the open meetings law. *Id.*

The petitioner in *Conta* argued that a less formalistic approach had been intended and urged a liberal construction. There, as here, it was argued that the law applies to those members of a governmental body who gather without following the formalities of convening a competent body. The supreme court responded that this contention was adequately rebutted by the statute's preamble:

The intent of this section is that the term "meeting" or "session" as used in this section shall not apply to any social or chance gathering *or conference not designed to avoid this section.*

*Id.* at 683, 239 N.W.2d at 329 (emphasis by the *Conta* court). Because *Conta* did not involve meetings consti-

tuting a conference, or fortuitous or social gatherings, the question of avoidance was not addressed. Even though *Conta* endorsed the formalistic approach and the two-prong balancing test in sec. 66.77(1), Stats. (1973), it did not preclude an examination of the circumstances of the gathering to determine whether avoidance was the purpose.

Our supreme court in *Conta* felt obliged to construe sec. 66.77, Stats., narrowly because the only enforcement remedy available at the time was a forfeiture, *id.* at 675–76, 239 N.W.2d at 325–26. The *Conta* court, however, opined in judicial dicta[2] that the requirements for open meetings could conceivably apply if public business were conducted at meetings consisting of: (1) all members of a governmental body; (2) a quorum of the members of a body; (3) a negative quorum of the members; or (4) a series of gatherings of less than the quorum, given the presence of certain circumstances. *Id.* at 682–89, 239 N.W.2d at 329–332.

The *Conta* court did not specifically hold that members of a governmental body could never gather to discuss business at a conference, or that a subquorum could not gather in a nonconference format. It simply stressed that "when a majority and thus a quorum gather, it is a rare occasion which can justify any action without open session compliance."[3] *Id.* at 685, 239 N.W.2d at 330.

---

[2] Judicial dicta, as opposed to *obiter dicta,* is not to be disregarded and may be persuasive. *See Buchner v. Chicago, Milwaukee, Northwest Railway Co.,* 60 Wis. 264, 19 N.W. 56 (1884); *cf.* R. Aldisert, *The Judicial Process* 798 (1976) (quoting R. Cross, *Precedent in English Law* 86 (2nd ed. 1968)).

[3] There thus appears in *Conta* to be the suggested seeds for the second sentence in sec. 19.82(2), Stats., in addition to the proof prob-

*Conta* was decided March 2, 1976. Section 66.77, Stats. (1973), was repealed four months later by ch. 426, Laws of 1975, and secs. 19.81–19.98, Stats., were created. Several changes occurred which, at first blush, appear to support Newspapers' "purpose only" argument. Under sec. 66.77(2)(b), the word "meeting" was defined as "the convening of a governmental body in a session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members." Present sec. 19.82(2) contains the following elongated definition:

"Meeting" means the convening of members of a governmental body *for the purpose* of exercising the responsibilities, authority, power or duties delegated to or vested in the body. If one-half or more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. *The term does not include any social or chance gathering or conference which is not intended to avoid this subchapter.* [Emphasis added.]

In comparing the old with the new, Newspapers asserts that sec. 66.77, Stats. (1973), was triggered only when the purpose of the meeting was to exercise any authority, power, duty or responsibility vested in the body as a whole and not in the individual members. In contrast, under the new expanded definition, a "meeting" encompasses a "convening of members of a governmental body" as opposed to the more restricted version examined in *Conta* that applied only to a "convening

lems the attorney general hoped to resolve by including such a sentence. *See infra* p. 170.

of a governmental body." Of additional significance, under the new definition a meeting takes place if the members are convened for the purposes of exercising any responsibility, authority, power or duty delegated to the body. Thus, reasons Newspapers, with changes so strikingly obvious the intention could not be clearer: the legislature intended the new statute to include a broad range of gatherings at which the number in attendance was irrelevant so long as official business was the purpose.[4] We conclude that this approach is overly

---

[4] Newspapers asserts in oral argument that *State v. Swanson,* 92 Wis. 2d 310, 284 N.W.2d 655 (1979), held that when members gather to exercise their responsibilities, such activity triggers the application of the open meetings law to the gathering. Swanson had argued that a meeting of the annexation and apportionment committee of which he was chairperson was convened for the purpose of exchanging information and not for the purpose of exercising the committee's responsibilities, authority or duties. He conceded that the committee was a governmental body under sec. 19.82, Stats. The supporting language of that decision for Newspapers' assertion reads:

The statute does not require or contemplate that committees must have . . . authority before they are subject to the provisions of the Open Meeting Law. The ultimate question is whether the members of a governmental body have convened for the purpose of exercising the responsibilities, authority, power, or duties delegated to or vested in the body . . . and not whether the governmental body is empowered to exercise the final powers of its parent body.

*Id.* at 317, 284 N.W.2d at 659.

This principle appears to support Newspapers' position. *Swanson,* however, dealt with a different situation. Unlike the case before us, *Swanson* involved a formally constituted subunit of a city council charged to "deal with . . . persons and corporations relative to annexation." *Id.* It was not a chance gathering, but a planned

simplistic and results in an insupportable interpretation of legislative intent.

Repeal of sec. 66.77, Stats. (1973), was first proposed in 1975 Senate Bill 630, three months after the *Conta* decision. This bill contained a modified definition of the term "meeting:" " 'Meeting' means the convening of a governmental body in any session at which a quorum is present. The term does not apply to any social or chance gathering or conference which is not intended to avoid this section." This modified definition was not received with equanimity, and the League of Women Voters complained that the proposal "leaves an unfortunate loophole that might invite circumvention based on a narrow legal line instead of emphasizing the broad meaning of the law." Legislative Reference Bureau Drafting Record, ch. 426, Laws of 1975. In reaction, the assembly introduced Assembly Substitute Amendment 3 to Senate Bill 630. This amendment defined "meeting" as follows: " 'Meeting' means the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. The term does not include any social or chance gathering or conference which is not intended to avoid this subchapter."

quorum meeting of *all* the committee members. The chairperson intentionally did not notify the news media, nor did he seek legal advice from the city attorney as to whether notice ought to be given. In essence Swanson attempted to argue that the absence of final power to bind the parent body, and the "conference" exception of sec. 19.82(2), Stats., overcame the rebuttable presumption that the existence of a quorum indicated the exercise of responsibilities vested in the body. Under the facts, the supreme court was left unpersuaded that the presumption had been rebutted. We find no fault with the principle enunciated in *Swanson* but hold that it does not apply to the facts of this case.

In commenting on this substitute amendment, the attorney general observed:

The purpose of a definition is to indicate the precise meaning the Legislature intends in its use of certain terms and to enable those who must interpret or comply with the law to do so as easily as possible. The Senate version requires the presence of a quorum. This fact is readily ascertainable. *Under the Assembly version, however, a determination must be made of the "purpose" or "intent" of the convening and the "responsibilities, authority, power or duties" of the body.* The need to make such a determination, possibly every time a governmental body convenes, seems to me to require an unnecessary burden. An easily ascertainable definition of a "meeting" which thus triggers the operative sections of the law would lessen the burden, *particularly on local government bodies.* Finally, since "purpose" may be difficult to prove, this definition encourages avoidance of the law.

An agreement was apparently reached by the conference committee which met just prior to the adjournment of the Legislature. The agreement uses the Assembly's wording and adds: "If a quorum is present, the convening is presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body." The compromise also adds a definition of "quorum" as meaning "one-half or more of the members of a governmental body unless otherwise defined by law or procedural rule." Although this compromise is acceptable to me, I would like to suggest an alternative to this language: "If one-half or more of the members of a governmental body are present, the convening is presumed to be for the purpose of exercising the responsibilities, authority, power or

duties delegated to or vested in the body." This eliminates an unnecessary definition of the word quorum and avoids the use of an ambiguous term, "procedural rule." [Emphasis added.]

Legislative Reference Bureau Drafting Record, ch. 426, Laws of 1975. The legislature did not pass Senate Bill 630 with its amendments, but on June 11, 1976, Special Session Senate Bill 1 was introduced. It included the definition of a "meeting" as proposed by the assembly substitute amendment with the attorney general's suggested modified version of the quorum requirement. The bill passed as introduced. Hence the definition of "meeting" as it exists in sec. 19.82(2), Stats., today.

The question remains, however, as to what these procedural peregrinations demonstrate in terms of legislative intent. Did "purpose" become the sole criterion for deciding whether a gathering fits the new definition of a meeting? Was any nonchance or nonsocial gathering of two or more members of a governmental body to come within the purview of the open meetings law? In sum, was statutory competence and/or corporate capacity to be totally disregarded?

In resolving the statutory ambiguity created by the compromise between the senate, the assembly, and the attorney general, we invoke the rules of statutory construction. We must avoid a construction that would make part of a statute superfluous. *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W.2d 47, 52 (1981). Statutes should be construed to reach a common sense meaning and to avoid unreasonable and absurd results. *State v. Britzke,* 108 Wis. 2d 675, 681, 324 N.W.2d 289, 291 (Ct.App. 1982). Finally, we must construe parts of a statute in harmony with each other so as to produce

171

a harmonious whole. *Milwaukee County v. DILHR,* 80 Wis. 2d 445, 454 n.14, 259 N.W.2d 118, 123 n.14 (1977). To achieve this goal, we pursue a functional approach, conscious of legislative history and its interpretation yet cognizant of the literal wording of secs. 19.81 and 19.82, Stats.

In reviewing the various subsections of sec. 66.77, Stats. (1973), the suggested amendments, and the enacted provisions of secs. 19.81 and 19.82, Stats., we find that certain language has remained constant. The first sentence of sec. 66.77(1), referring to a two-prong policy purpose, was incorporated in substance in both the senate and assembly versions and exists in present sec. 19.81(1), Declaration of Policy.[5] The definition of a "governmental body" in essence also remains intact. Finally, the original words of exception to the definition of a "meeting" contained in sec. 66.77(1), *i.e.* " 'meeting' . . . shall not apply to any social or chance gathering or conference not designed to avoid this section," were also included in both legislative versions and are presently extant in sec. 19.82(2).

In adopting sec. 19.82, Stats., the legislature deleted the language in sec. 66.77(2)(b), Stats. (1973), that read "the convening of a governmental body in session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members." Nevertheless, the word "body" was retained.

---

[5] Concurring with the majority disposition in *Conta,* Chief Justice Wilkie gave expression to the same broad application by stating: "I think that the open meetings law should be liberally construed so as to effectuate this broad public policy." 71 Wis. 2d at 701, 239 N.W.2d at 338 (Wilkie, C.J., concurring). This concurring expression was, in effect, incorporated into sec. 19.81(4), Stats.

Section 19.82(2), in pertinent part reads: " 'Meeting' means the convening of members of a governmental body for the purpose of exercising the responsibilities . . . delegated to or vested in the body." This first sentence includes the words "convene," "governmental body" (as defined in sec. 19.82(1)), "delegated to" and "vested in." These words, taken together, create a reasonable and understandable inference of formality that, at the very least, imply the necessity of the potency to act or to commit the body as a whole to a course of action. Without extrinsic aids pointing to the contrary, we cannot conclude that the word "body" is merely descriptive, has no redeeming significance, and is to be totally disregarded.

If it were the legislature's intention to completely eliminate all consideration of the corporate capacity to discharge the responsibilities corporately vested, it had only to phrase the statute to read: "Gathering of any two or more members of a governmental body for the purpose of exercising their corporate or individual responsibilities." This it did not do. The language of sec. 19.82(2), Stats., reasonably refers to responsibilities charged to a corporate agency or subunit of government, not to the responsibilities of the individual members as constituent parts of the body. Common sense leads us to conclude that four members out of eleven do not have the responsibilities, the power, the authority or the duties vested in the body. The "body" refers not to the people meeting, but to the governmental unit to which the members belong.

In attempting to downplay the word "body" and its parliamentary significance, Newspapers points to the absence of any minimum required number of members for a meeting or of the necessity that the group possess

173

the same power vested in the total body. While these observations are correct, they do not logically compel the conclusion suggested by Newspapers.

First, there is no necessity to list a minimum number in this subsection, because quorum requirements are supplied in other statutory provisions,[6] and because the focus of the statute is not on numbers but on *sub rosa* efforts to exercise governmental power. Thus, the existence of corporate capacity depends on the circumstances, not just the number of attendees. Second, the ability to discharge a corporate responsibility does not require that the power to execute be coextensive with the power vested in the total body, *i.e.* the commission as a whole. Otherwise, the ability to delegate to subunits would be meaningless.

The corporate capacity to execute a given charge may be either expressed or reasonably implied. Regardless, the capacity to discharge corporate responsibility must exist either directly or indirectly. The *Conta* court recognized that governmental bodies might employ various procedural devices, *i.e.* disguised quorums, to indirectly discharge corporate responsibility in avoidance of the law. *Conta,* 71 Wis. 2d at 687, 239 N.W.2d at 331. The trial court here paid heed to the problem by referring to "rump sessions." Newspapers acknowledges it in this appeal.

We conclude that the legislature, in creating sec. 19.82(2), Stats., intended to broaden the scope of the

---

[6] Section 66.886(1), Stats., requires a quorum of six commissioners for the transaction of business. In 66.886(2)(a), Stats., however, the need for a "super-quorum" of eight, or even nine, commissioners is inherent in the requirement of super-majority votes for various funding proposals.

open meetings law. There is, however, no indication that the legislature intended to diminish the significance of balancing the value of open government with the value of its proper administration. In broadening the coverage of the law in keeping with the judicial dicta of *Conta,* the intention of the legislature was to reach negative quorums, "walking quorums,"[7] quorums-by-proxy[8] and disguised de facto subunits:

[7] In *Brown v. East Baton Rouge Parish School Board,* 405 So. 2d 1148, 1155–56 (La. App. 1981), the court recognized the "walking quorum" concept. That is, a school board made up of twelve members could have a "walking quorum" even if seven members were not in the same room at the same time. An overlapping series of meetings or telephone conferences could establish the factual basis for such a determination.

[8] The open meetings law is violated where the record demonstrates that absent members granted proxy authority to another to make decisions in their name at a closed negotiating decision. In the instant case, petitioner Rothe, a reporter for Newspapers, asserted in her deposition that the four commissioners had been implicitly delegated the authority to resolve the funding dispute by their absent colleagues since each of the four had assumed "leadership" positions on the issue in prior open meetings. This bare assertion, without more, obviously fails to establish proxy authority for purposes of the open meetings law.

The *Conta* court acknowledged the possibility of such quorums-by-subterfuge:

It is certainly possible that the appearance of a quorum could be avoided by separate meetings of two or more groups, each less than quorum size, who agree through mutual representatives to act and vote uniformly, or by a decision by a group of less than quorum size which has the tacit agreement and acquiescence of other members sufficient to reach a quorum. Such elaborate arrangements, if factually discovered, are an available target for the prosecutor under the simple quorum rule.

*Conta,* 71 Wis. 2d at 687, 239 N.W.2d at 331.

succinctly, all groups that actually possess, either expressly or implicitly, the corporate power to discharge a corporate responsibility.

Statutes ought not be construed in derogation of common sense. *State v. Clausen,* 105 Wis. 2d 231, 246, 313 N.W.2d 819, 826 (1982). To achieve what sec. 66.77, Stats. (1973), could not, yet retain a common sense functional approach, the legislature incorporated a subjective (purpose) standard while at the same time retaining features of the objective (competency) standard of sec. 66.77. Newspapers now seeks the complete abolition of the competency standard. We conclude that such a narrow construction is not warranted by the legislative history of secs. 19.81 and 19.82, Stats., and would be contrary to legislative intent. We therefore decline Newspapers' invitation.

## PUBLIC POLICY CONSIDERATIONS

Newspapers next contends that the public policy underlying the open meetings law requires a construction allowing public access to the December 1 meeting. In doing so it acknowledges that a balancing standard exists between openness and efficiency, but stresses that the legislature decided to balance these interests heavily in favor of public access.

As mentioned earlier in this opinion, the two-prong balancing of interests test was originally enacted in sec. 66.77(1), Stats. (1973). In reviewing its provisions, the *Conta* court initially declared:

Although the initial wording indicates that a broad application is intended, a qualification appears

176

by the language that the adherence will be only such "as is compatible with the conduct of governmental affairs and the transaction of governmental business." Apparently if open session requirements prevent the fair process of democratic government, the specific requirements are relaxed.

*Conta,* 71 Wis. 2d at 678, 239 N.W.2d at 327. Considering the implications of ignoring this policy, the supreme court later opined:

To impose open session requirements on all government business discussions between at least two members of the same body, merely on the basis that such discussion somewhat enhances the possibility that mutual interests will be furthered and possibly carried out in the form of some future official action, would virtually impede much of the preliminary labor involved in any government action and thus be incompatible with the necessary "conduct of governmental affairs and the transaction of governmental business."

A law embracing such private discussions would raise many constitutional objections. Given a choice of possible interpretations, this court must select the construction that results in constitutionality rather than invalidity, just as we will choose a reasonable construction rather than one that leads to unreasonable or absurd results.

*Id.* at 689, 239 N.W.2d at 332 (citation omitted).

We find nothing in secs. 19.81 or 19.82, Stats., to emasculate or substantially qualify the soundness of *Conta*'s reasoning. The weakness in Newspapers' contention is that it relies solely on the subjective purpose test, with the result that there is no minimum number of people to whom the statute may apply. Indeed,

Newspapers acknowledges in its brief that certain gatherings may be exempted, but insists that the standard implied by secs. 19.81 and 19.82 is: "[W]here there is a *deliberate* meeting of two or more officials *planned* for *serious* discussion and compromise of a *disputed* issue which is to be acted on by the full body in the *immediate* future, the meeting should be open to the public." (Emphasis added.) We admire Newspapers' forthrightness but conclude their standard must perish from self-inflicted wounds. How can our public officials, much less our courts, decipher what "the immediate future" is, what "a disputed issue" is, what "a deliberate meeting" is? And, above all else, how can one discern when a "serious discussion" took place? The *Conta* court warned that construing the old open meetings law to include minority gatherings of two members or more would resurrect the problems inherent in vague and overbroad statutes. *Id.* at 689–90, 239 N.W.2d at 332. Newspapers' suggested standard gives substance to the *Conta* court's concern, and we decline to adopt it.

We conclude that Newspapers' interpretation ignores, and renders meaningless, the balancing test in sec. 19.81, Stats., which mandates that openness must be compatible with the efficient conduct of governmental business. The legislature would not intend such a result. In determining that Newspapers' public policy argument must fail, we reasonably assume that the legislature that passed secs. 19.81–19.98, Stats., was as concerned with its ability to carry out its duties as was the legislature that adopted sec. 66.77, Stats.

## THE NEGATIVE QUORUM EXCEPTION

Lastly, Newspapers argues that if this court disagrees with its "purpose only" test and wishes to apply a stricter construction, we must still declare the December 1 meeting unlawful because a negative quorum was present. The basis for Newspapers' contention is the statutory requirement of a two-thirds majority vote in matters concerning financing for the district. Sec. 66.886(2)(a)1, Stats. Newspapers asserts that since any four commissioners could block passage of a financing resolution, the four commissioners who met on December 1 had the potential to obstruct passage of a resolution not to their liking and, therefore, constituted a negative quorum in violation of the spirit of the law.

Newspapers' approach to the negative quorum concept is amorphous at best. While stressing the power possessed by any four commissioners to block a budget resolution, Newspapers ignores the reality of the political imbroglio that led to the December 1 meeting. Although the participants in this meeting came from competing blocs, Newspapers refuses to recognize the participants' premeeting and postmeeting views, as well as the subject matter actually discussed. If, as we have already decided, the open meetings law is intended to prevent negative quorums, Newspapers must still show that there was more than mere potential here for a negative quorum to operate. It has failed to do so.

In *Conta,* our supreme court was unwilling to accept an "influence argument" even when all the public officials were of the same political party. Here, partisanship is not involved. The only justifiable character-

179

ization of the sewerage commission alignment would be city versus suburban interests. With nothing in the record to show that these two city and two suburban members had any proxy authority, official or unofficial, to commit their respective sides, the existence of a negative quorum is based on too many assumptions and too much conjecture. Thus, we reject Newspapers' post hoc rationalization that since the commission adopted a tax levy the next day, the four commissioners at bar must have been empowered to negotiate on behalf of their colleagues.[9] The precise purpose of the meeting in question is uncertain. There is no evidence in the record that the gathering was planned, that anyone knew how many would attend, or that the other six commissioners not in attendance knew who was asked to attend or knew who did attend. Nor is there any proof that the tax levy vote was tied to any discussion at the meeting. Significantly, a city commissioner who declined an invitation to attend the meeting voted against the adopted measure. Short of some showing in the record that an actual negative quorum existed, Newspapers' argument must fail.

On the basis of the stipulated facts discussed herein, we hold that the open meetings law did not require the gathering of the four commissioners on December 1 be open. The trial court, after reviewing the facts, held that the four commissioners did not have the corporate capacity to act. It correctly applied the

---

[9] In the absence of support in the record, an argument of antecedents-and-circumstances is not equivalent to an argument of antecedents-and-consequences or cause-and-effect. *Cf.* S. Smith, *Precepts of Rhetoric* 10–14 (1950). Thus, Newspapers' argument here is an example of the *post hoc ergo propter hoc* fallacy.

two-prong balancing test to the facts of this case and found in favor of the practical necessity of conducting the ordinary affairs of government. It did not err. We affirm.

*By the Court.*—Judgment affirmed.