STATE of Wisconsin EX REL. NEWSPAPERS
INC., a Wisconsin corporation, and Karen S.
Rothe, Plaintiffs-Appellants-Petitioners,
v.

Dean A. SHOWERS, Edwin J. Laszewski, Jr.,
Mary M. Wilkinson and Theodore J. Fadrow,
Defendants-Respondents.

Supreme Court

*No. 85–0471. Argued October 28, 1986.—Decided January 15, 1987.*

(Also reported in 398 N.W.2d 154.)

For the plaintiffs-appellants-petitioners there were briefs by *Dennis L. Fisher* and *Meissner, Tierney, Ehlinger & Whipp, S.C.*, Milwaukee, and oral argument by *Mr. Fisher.*

For the defendants-respondents the cause was argued by *Patrick Halligan*, senior staff attorney, with whom on the brief was *Michael J. McCabe*, director of legal services, for Milwaukee Metropolitan Sewerage District.

Amicus curiae brief was filed by *Linda M. Clifford* and *La Follette & Sinykin*, Madison, for the Wisconsin Newspaper Association.

BABLITCH J. Does Wisconsin's Open Meeting Law apply when the number of members of a governmental body present at a meeting constitute less than half the membership of the full body? We are asked to interpret a statute that does not specifically answer "yes" or "no" to that question. Some statutes of other states expressly apply only to meetings of a quorum of the membership of a governmental body;[1] statutes of other states expressly apply whenever two or more or three or more members of a governmental body meet.[2] Wisconsin's Open Meeting Law is silent on this

---

[1] *See, e.g.*, Alaska Stat. sec. 44.62.310 (Cum. Supp. 1986), Del. Code Ann. tit. 29, sec. 1002(e) (1981) and Hawaii Rev. Stat. sec. 92-2(3) (1976).

[2] *See, e.g.*, Col. Rev. Stat. sec. 24-6-402 (Cum. Supp. 1985), Va. Code Ann. sec. 2.1-341(a) (Cum. Supp. 1986).

point, thereby leaving the interpretation of legislative intent to this court.

Newspapers Inc. and Karen S. Rothe (Newspapers Inc.) appeal, arguing that the Open Meeting Law applies to a meeting held by four Milwaukee Metropolitan Sewerage District Commissioners (Commissioners) to discuss the operating budget and the capital budget of the Milwaukee Metropolitan Sewerage Commission (Commission). Passage of these measurers required a two-thirds vote. Although the four members present at the meeting did not constitute a majority of the eleven member Commission, these four did have the power if they so chose to determine the parent body's course of action regarding the budget because they could, by voting together, block the adoption of any proposed budget of the Commission.

We hold that whenever members of a governmental body meet to engage in government business, be it discussion, decision or information gathering, the Open Meeting Law applies if the number of members present are sufficient to determine the parent body's course of action regarding the proposal discussed at the meeting. Because the purpose of the meeting was to engage in government business, i.e. the discussion of the capital and operating budgets, and because the number of commissioners at the meeting were sufficient in number to block any proposed budgets, the Open Meeting Law applied.

At the outset, it is important to briefly discuss the fundamental issue involved here. The fundamental issue is the right of the public to be fully informed regarding the conduct of government business. It is not the right of the media in general, or a specific newspaper or a particular reporter; it is the right of the public to access.

The Commissioners' brief unfortunately labels the appeal by Newspapers Inc. a "form of business litigation in aid of its enterprise ... [which] claims a privileged position." We do not view this case in that manner, and we trust the public does not either. The public has by far the largest stake in the litigation of these issues. An informed public is essential to representative government. Practical realities dictate that very few of our citizens have the ability to be personally present during the conduct of government business. If we are to have an informed public, the media must serve as the eyes and ears of that public. Although the media does not have a privileged position, if the media is denied access to the affairs of government, the public for all practical purposes is denied access as well. A democratic government cannot long survive that burden.

The relevant facts are not in dispute. Defendants are members of the Milwaukee Metropolitan Sewerage Commission. The Commission is the governing body of the Milwaukee Metropolitan Sewerage District, and is a governmental body under sec. 19.82(1), Stats., of the Open Meeting Law. The Commission consists of eleven members, seven from Milwaukee and four from the surrounding suburbs.

One of the duties of the Commission is to adopt an operating budget and a capital budget. A two-thirds vote of the total membership of the Commission is required for passage of financing measures. *See* sec. 66.886(2)(a)1, Stats. Because of this two-thirds majority voting requirement, four commissioners can block passage of a resolution on financing measures.

In the fall of 1983, a dispute arose between the city and suburban commissioners regarding the method of funding to be used for the 1984 budget. Neither city nor

suburban commissioners were able to obtain the required two-thirds majority to pass funding measures because the city commissioners rejected the suburban commissioners' proposals and vice versa. No proposal had garnered the required eight votes. However, tax bills were scheduled to be mailed out beginning in early December and the Commission was under pressure to pass a tax levy in time to include a charge for sewerage service in those bills.

In an attempt to break the deadlock, the Commission met several times during the week of November 28—December 2. On December 1, 1983, there was a meeting at which the stalemate continued. Following the meeting, the four defendants met privately to discuss the impasse. Two of the defendants occupied city seats, while the other two defendants were suburban commissioners. It is this meeting that is the subject of this appeal.

No announcement was made of the closed December 1 meeting. The purpose of the private meeting, conceded by the defendants, was to conduct a "sincere discussion" of differences on the funding question, to move issues along, and to discuss the funding issue "without political posturing." A reporter for the Milwaukee Sentinel present at the open meeting on December 1, petitioner Karen S. Rothe, was not allowed to attend the closed meeting.

The next day, the Commission met again. A tax levy resolution offered by defendant Showers and seconded by defendant Wilkinson passed by a vote of nine to one. On January 19, 1984, Newspapers Inc. initiated this action in Milwaukee County Circuit Court. Alleging that the December 1 closed meeting violated the Open Meeting Law, Newspapers Inc. sought a declaratory judg-

ment that the Commissioners had violated that law. In addition, Newspapers Inc. requested the court to void any action taken at the meeting, to impose a fine on each Commissioner, and to award Newspapers Inc. their costs and attorneys' fees. Newspapers Inc. moved for summary judgment on August 16, 1984. They alleged that no genuine issue of material fact remained as to the circumstances surrounding the meeting, and argued that they were entitled to judgment as a matter of law, based on the pleadings and excerpts from depositions. On September 26, 1984, the Commissioners also moved for summary judgment on the basis of the undisputed facts. The parties were in agreement as to the time and place of the meeting, the number attending, the subject discussed, and the fact that the meeting was closed. The only issue remaining—whether such a meeting was a violation of the Open Meeting Law—required interpretation of secs. 19.81 and 19.82, Stats., and was therefore a question of law. *E.g., Bingenheimer v. DHSS*, 129 Wis. 2d 100, 106, 383 N.W.2d 898 (1986).

The trial court concluded that the Commissioner's meeting was not a "meeting" as defined by the Open Meeting Law. The trial court's decision was based on the fact that a quorum was not present, that the four Commissioners who met lacked the capacity to conduct business, spend money, or establish policy, and that in this case, the right of government officials to speak and confer privately outweighed the public's right to know how government decisions are reached. Newspapers Inc. appealed.

The court of appeals affirmed the trial court's decision. *State ex rel. Newspapers v. Showers*, 128 Wis. 2d 152 (1985). In its opinion, the court concluded that sec. 19.82(2), Stats. was ambiguous and interpreted it to

cover those meetings at which a negative quorum, i.e. a number of members sufficient to block action, was present. However, continued the court, as "the capacity to discharge corporate responsibility must exist either directly or indirectly," *Id.* at 174, only those negative quorums with "more than mere potential . . . to operate" posed a violation of the Open Meeting Law. *Id.* at 179. Because the December 1 meeting involved two Commissioners from each side or coalition, the court of appeals concluded that there was nothing in the record to show that the Commissioners could unite to determine a course of action or inaction by the entire Commission. The court of appeals noted that the record contained no evidence that the Commissioners had been delegated any proxy authority. The court of appeals concluded that because Newspapers Inc. had failed to show that an actual negative quorum had existed, the trial court had correctly granted the Commissioners' motion for summary judgment.

At oral argument, Newspapers Inc. also conceded the four Commissioners did not have the proxies of any other member of the Commission. Newspapers Inc. further conceded that forfeiture is not appropriate here. The relief they request is a declaration by this court that the closed meeting of the four Commissioners on December 1 was in violation of Wisconsin's Open Meeting Law.

The issues presented are 1) whether the Open Meeting Law applies to meetings of members of a governmental body at which less than one-half are in attendance; 2) if so, does the Open Meeting Law apply to this particular meeting?

Resolution of the issues before this court—whether the particular facts constitute a violation of the Open Meeting Law—requires interpretation of secs. 19.81 and 19.82, Stats. A question of statutory construction is a question of law. *Sacotte v. Ideal-Werk Krug & Priester*, 121 Wis. 2d 401, 405, 359 N.W.2d 393 (1984). Questions of law such as statutory construction are reviewable *ab initio* by this court. *Revenue Dept. v. Milwaukee Brewers*, 111 Wis. 2d 571, 577, 331 N.W.2d 383 (1983). Thus, this court owes no deference to the lower courts' resolution of the issue.

In resolving the issue of whether the Open Meeting Law applies to meetings of less than one-half of the members of a governmental body we first look to the statute itself, specifically the meaning of the word "meeting." Although that word is defined in the statute, it has been given one interpretation by the trial court, a different interpretation by the court of appeals, yet another interpretation by Newspapers Inc., and still yet another interpretation by the Commissioners.

We agree with the court of appeals that secs. 19.81 and 19.82, Stats., of the Open Meeting Law are ambiguous. The statutes read:

> "19.81 Declaration of policy. (1) In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business.
>
> "(2) To implement and ensure the public policy herein expressed, all meetings of all state and local governmental bodies shall be publicly held in places

reasonably accessible to members of the public and shall be open to all citizens at all times unless otherwise expressly provided by law.

"(3) In conformance with article IV, section 10, of the constitution, which states that the doors of each house shall remain open, except when the public welfare requires secrecy, it is declared to be the intent of the legislature to comply to the fullest extent with this subchapter.

"(4) This subchapter shall be liberally construed to achieve the purposes set forth in this section, and the rule that penal statutes must be strictly construed shall be limited to the enforcement of forfeitures and shall not otherwise apply to actions brought under this subchapter or to interpretations thereof.

"19.82 Definitions. As used in this subchapter:

"(1) 'Governmental body' means a state or local agency, board, commission, committee, council, department or public body corporate and politic created by constitution, statute, ordinance, rule or order; a governmental or quasigovernmental corporation; or a formally constituted subunit of any of the foregoing, but excludes any such body or committee or subunit of such body which is formed for or meeting for the purpose of collective bargaining under subch. IV or V of ch. 111.

"(2) 'Meeting' means the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. If one-half or more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body. The term does not include any social or chance gathering or

conference which is not intended to avoid this sub-chapter.

"(3) 'Open session' means a meeting which is held in a place reasonably accessible to members of the public and open to all citizens at all times. In the case of a state governmental body, it means a meeting which is held in a building and room thereof which enables access by persons with functional limitations, as defined in s. 101.13(1)."

A statute, or a portion of a statute, is ambiguous if it is capable of being understood by a reasonably well informed person in more than one way. *Department of Revenue v. Nagle-Hart, Inc.*, 70 Wis. 2d 224, 227, 234 N.W.2d 350 (1975). An ambiguity can be created by the interaction of two statutes or by the interaction of the words and structure of the statute itself. *Morrissette v. DeZonia*, 63 Wis. 2d 429, 436, 217 N.W.2d 377 (1974). The statute is ambiguous because a reasonably well informed person could interpret "meeting" to cover the convening of as few as two members of a governmental body to discuss issues before the body, a meeting of one-half or more of the body's membership, a meeting of a quorum, or a meeting limited to a gathering where those present have the ability to exercise corporate power. Because the Open Meeting Law is ambiguous regarding which types of meetings are covered, this court must examine the legislative history, purpose, and broader context of the Open Meeting Law to interpret the statute.

The legislative history of the present Open Meeting Law traces its roots to January 29, 1975. It was on that date that Assembly Bill 222, otherwise known as the 1975-77 Budget Bill, was introduced in the assembly. The bill was immediately referred to the legislature's

Joint Committee on Finance (Committee) as provided by rule. The Committee was comprised of fourteen members, nine from the assembly and five from the senate. Of the assembly members, 7 were Democrats and 2 were Republicans. Of the five senate members, four were Democrats and one was Republican. The budget bill remained in the Committee until May 6, 1975.

On March 11, 1975, the eleven Democratic members held a private meeting. On April 24, 1975, the seven Democratic members from the assembly held another private meeting. The purpose of those meetings was to discuss the budget bill which was still in their Committee. It was conceded there was no compliance with the Open Meeting Law.

The Open Meeting Law then in effect, sec. 66.77, Stats. 1973, the predecessor to secs. 19.81–87, provided in part:

> "Open meetings of governmental bodies. (1) In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental affairs and the transaction of governmental business. The intent of this section is that the term 'meeting' or 'session' as used in this section shall not apply to any social or chance gathering or conference not designed to avoid this section.
>
> "(2) In this section:
>
> " . . . .
>
> "(b) 'Meeting' means the convening of a governmental body in a session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members.

" . . . .

"(d) 'Open session' means a meeting which is held in a place reasonably accessible to members of the public, which is open to all citizens at all times, and which has received public notice.

" . . . .

"(3) Except as provided in sub. (4), all meetings of governmental bodies shall be open sessions. No discussion of any matter shall be held and no action of any kind, formal or informal, shall be introduced, deliberated upon, or adopted by a governmental body in closed session, except as provided in sub. (4). Any action taken at a meeting held in violation of this section shall be voidable."

On August 25, 1975, the district attorney of Dane county received a complaint from Senator Gary Goyke regarding those meetings. He requested the district attorney to file suit. Goyke was a Democratic member of the senate but was not a member of the Joint Finance Committee.

The Dane county district attorney petitioned this court to render a declaratory judgment on the question of whether the Open Meeting Law was violated by the seven Democratic assembly members of the Committee at these meetings. No judgment was requested, according to his pleadings, concerning the four Democratic senators on the Committee because they had voluntarily ceased their participation in the meetings after the Attorney General, Bronson LaFollette, in an informal opinion issued on March 29, 1975, opined that the statute applied to the March 11 meeting.[3]

---

[3] The above historical facts, unless otherwise noted, are derived from *State ex rel. Lynch v. Conta*, 71 Wis. 2d 662, 239 N.W.2d 313 (1976) and a stipulation of facts filed in that case on November 17, 1975.

In a decision dated March 2, 1976, *State ex rel. Lynch v. Conta*, 71 Wis. 2d 662, 239 N.W.2d 313 (1976), this court reached a number of conclusions regarding the Open Meeting Law, sec. 66.77, Stats., including the following:

First, it concluded that strict interpretation, as opposed to liberal interpretation, was the appropriate standard to apply.

Second, the court concluded the obvious: that when a quorum gathers, and its purpose is to engage in formal or informal governmental activity, the law applied:

> "When the members of a governmental body gather in sufficient numbers to compose a quorum, and then intentionally expose themselves to the decision-making process on business of their parent body—by the receipt of evidence, advisory testimony, and the views of each other—an evasion of the law is evidenced. Some occurrence at the session may forge an open or silent agreement. When the whole competent body convenes, this persuasive matter may or may not be presented in its entirety to the public. Yet that persuasive occurrence may compel an automatic decision through the votes of the conference participants. The likelihood that the public and those members of the governmental body excluded from the private conference may never be exposed to the actual controlling rationale of a government decision thus defines such private quorum conferences as normally an evasion of the law. The possibility that a decision could be *influenced* dictates that compliance with the law be met." *Id.* at 685–86.

Third, the court addressed the more difficult problem posed when the number of members present constitute a sufficient number to block passage of an impend-

ing bill. Again, the court concluded that the Open Meeting Law applied:

> "Only seven of the fourteen members of the committee were present at the April 24, 1975 meeting. This is less than a quorum. *Amicus Curiae* attorney general would find no violation here. Petitioner and citizen complainant Gary R. Goyke urge that this private conference was in violation of the law.
>
> "The arguments of Goyke on the circumstances presented in the April 24th meeting are clear and persuasive. Because the committee has an even number of members, all action can be effectively stymied if seven members, one-half of the whole body, vote and act in concert, a unit vote that may occur because the seven have engaged in private, group investigation of the matters before their parent body. It is a short step from the initial and predictable ability to frustrate all action to thereafter control it, through the shift of one member of the unorganized other half. In committees with an even number of members, this 'negative quorum' has the automatic potential of control that, like quorums elsewhere, dictates that it publicly engage in the public's business." *Id.* at 686.

Fourth, the court addressed at length the question of whether the law applied to a gathering of only two members of a governmental body who have neither the power to pass nor the power to block proposals. With a lengthy discussion, the court summarily concluded that the law did not apply: "An absolute rule requiring an open session, simply when only two members of a body confer, clearly is not within the statute." *Id.* at 687–88. This point, discussed at great length in *Conta, Id.* at 687–88, is critical to our interpretation of the present law.

91

Fifth, to the extent any confusion existed regarding the types of meetings covered by sec. 19.77, Stats., *Conta* made it clear that the law covered formal as well as informal action, i.e. discussion, decision, and information gathering:

> "When the members of a governmental body gather . . . and then intentionally expose themselves to the decision-making process on *business of their parent body—by the receipt of evidence, advisory testimony, and the views of each other*—an evasion of the law is evidenced." *Id.* at 685–86. (Emphasis added.)

Lastly, the court addressed the problems that arise with the so-called "walking quorums," i.e. a series of meetings of groups less than a quorum. Again, the court concluded that under the appropriate circumstances, the Open Meeting Law would apply:

> "It is certainly possible that the appearance of a quorum could be avoided by separate meetings of two or more groups, each less than quorum size, who agree through mutual representatives to act and vote uniformly, or by a decision by a group of less than quorum size which has the tacit agreement and acquiescence of other members sufficient to reach a quorum. Such elaborate arrangements, if factually discovered, are an available target for the prosecutor under the simple quorum rule." *Id.* at 687.

Notwithstanding the above conclusions, the *Conta* court held that because of the then existing exception for "partisan caucuses *of members* of the state legislature;" sec. 66.74(4)(g), Stats. (emphasis added), the meetings were not within the ambit of the Open Meeting Law. *Id.* at 692–93. (In contrast, sec. 19.87(3) provides "No provision of this subchapter shall apply to

any partisan caucus of the senate or any partisan caucus of the assembly, except as provided by legislative rule." )

Then Chief Justice Wilkie concurred, stating his view that the statute should be interpreted liberally. Justice Robert W. Hansen dissented, arguing to a point neither reached nor decided by the majority. He argued that when less than half the members of a governmental body gather with the intent to avoid the law and they have the ability to control the outcome of a decision to be made by the parent body, the law should apply:

> "The writer agrees with these conclusions of the court majority, but would add that a secret session or conference of less than one-half of the members of a legislative committee or governmental body ought also be held to be illegal where there is present an intent to avoid the statute, plus the ability to control or determine a decision to be made at the public session of the committee or body." *Id.* at 703.

Such were the circumstances less than four months later when the legislature met in Special Session and considered a new and different Open Meeting Law. They repealed sec. 66.77, Stats. 1973, and secs. 19.81–87, were created.

For our purposes, there were three significant changes between the repealed law and the present law, secs. 19.81 and 19.82, Stats. First, sec. 19.81(4) directed that the law be liberally construed to achieve the purposes set forth in the chapter.

Next, the definition of the word "meeting" was changed. Under the old law, sec. 66.77, Stats., "meeting" was defined as "the convening of a governmental body. . . . " The new law, sec. 19.82(2) defined "meeting" as a "convening of *members of a* governmental body. . . . " (Emphasis added.)

Last, sec. 19.82(2), Stats., added the "purpose" language; "convening of members of a governmental body *for the purpose* of exercising the responsibilities, authority, power or duties delegated to or vested in the body." These four terms had appeared in sec. 66.77(2)(b): "(b) 'Meeting' means the convening of an governmental body in a session such that the body is vested with authority, power, duties or responsibilities not vested in the individual members."

The changes from the old law to the new did not occur without significant interaction between the houses. Repeal of sec. 66.77, Stats. 1973, was first proposed in 1975 Senate Bill 630, on September 18, 1975, one-half month before the petition for leave to commence the original action in *Conta* was filed in this court. This bill contained a modified definition of the term "meeting," limiting its application to meetings of a quorum or more: " 'Meeting' means the convening of a governmental body in any session at which a quorum is present. The term does not apply to any social or chance gathering or conference which is not intended to avoid this section." This modified definition was not received with equanimity, and the League of Women Voters complained that "[D]efining 'meeting' in terms of whether a quorum is present leaves an unfortunate loophole that might invite circumvention based on a narrow legal line instead of emphasizing the broad meaning of the law." Legislative Reference Bureau Drafting Record, ch. 426, Laws of 1975. In reaction, the assembly introduced Assembly Substitute Amendment 3 to Senate Bill 630.

The Assembly Substitute Amendment defined "meeting" as follows: " 'Meeting' means the convening of members of a governmental body for the purpose of

exercising the responsibilities, authority, power or duties delegated to or vested in the body. The term does not include any social or chance gathering or conference which is not intended to avoid this subchapter."

The bill passed back and forth between the senate and the assembly, but they failed to agree. A Committee on Conference composed of three members of each house was formed on March 26, 1976, in an attempt to reach agreement, but they failed to do so. Senate Bill 630 died with adjournment on March 31, 1976. However, the members of the Committee on Conference continued to meet and negotiate as an informal committee during the months of April and May, 1976. Senator Goyke was a member of both Committees. The informal Committee on Conference eventually agreed upon a bill which Governor Patrick J. Lucey agreed to place on the agenda of the June, 1976, Special Session.[4]

On June 11, 1976, the product of the Committee's deliberations, Special Session Senate Bill 1 was introduced. It included the definition of a "meeting" as proposed by the Assembly Substitute Amendment. The bill passed as introduced. Hence the definition of "meeting" as it exists in sec. 19.82(2), Stats., today.

The Assembly Substitute Amendment also deleted two provisions from the senate version. These were:

"To implement and ensure the public policy herein expressed, all meetings of all state and local governmental bodies shall be publicly held in places reasonably accessible to members of the public and shall be open to all citizens at all times unless expressly provided by law."

---

[4] *See* Wis. State J. (Madison, Wis.), March 27, April 23, April 28, May 8 and May 14, (1976).

*and*

"This subchapter shall be liberally construed to achieve these purposes and the rule that penal statutes must be strictly construed shall be limited to the enforcement of forfeitures and shall not otherwise apply to actions brought under this subchapter or to interpretations thereof."

The attorney general's comments on the assembly version are informative. He criticized the deletions, arguing that the deletions would create a presumption for closed government meetings. He urged these two provisions be put back into the bill:

"Taken together, these provisions put the Legislature squarely behind openness in government and provide the courts with a clear statement of the Legislature's intent. By eliminating these provisions, the Assembly version opens the door to an interpretation which favors a presumption that governmental meetings can be closed. Obviously, the policy of the state should be the other way around. The second provision cited above is particularly important in light of the State Supreme Court's recent decision which was based upon a strict interpretation of the entire statute because it contains a penalty clause. The Senate version clearly provides for a liberal construction except in forfeiture actions." Legislative Reference Bureau Drafting Record, ch. 426, Laws of 1975.

Both provisions were reinserted in Special Session Senate Bill 1 and are found in secs. 19.81(3) and (4), Stats.

Thus, from January 1975 to September 1976, we see, from our vantage point ten years after the fact,

significant events that aid us in our interpretive efforts: the budget is introduced; private meetings by Democrats are held, including one that had exactly one-half the membership of the Committee in attendance; a Democratic senator sues his fellow Democrats by filing a complaint with the district attorney; the *Conta* court while exempting these particular meetings, concludes that even though existing law does not apply to *every* gathering of governmental officials regardless of number, the law does apply to meetings of one-half the members of a governmental body because of their potential to frustrate all action; within four months of the *Conta* court decision, a new law is passed but not without a great deal of interaction between the houses. Today we are asked to interpret the heart of that law, sec. 19.82(2), Stats.

What can we glean from all of the above? Certain conclusions are inescapable.

First: The legislature, in creating sec. 19.82(2), Stats., intended to broaden the scope of the Open Meeting Law. The majority in *Conta* applied strict interpretation. The new law directed that except for forfeiture actions it be interpreted liberally. The old law covered only those meetings which were a convening of the governmental body; the new law covered meetings of members of the governmental body. The legislature rejected an assembly amendment which would have created a presumption of closed meetings, and opted for language that created a presumption of open public meetings of governmental bodies.

Second: The legislature, in determining the "trigger" of the Open Meeting Law, rejected "numbers" as the trigger for application. It is important to note here that there were three courses of action that this legisla-

ture most certainly did not take. They did not choose to trigger the statute by automatically applying the law to any deliberate meetings involving governmental business between two or more officials. This point is most critical. Were this their intention, the legislature had only to phrase the statute to read: "Gathering of any two or more members of a governmental body...." This they did not do. The failure to do so had.to be a deliberate choice. Given the political implications inherent in the *Conta* case, and the fact that some of the members were being sued by one of their own, the legislature had to be paying close attention to the case. These factors combined with the ramifications the decision would have on its own internal procedures, mean that it had to be extremely aware of *Conta*, its language, and all its implications. The *Conta* decision with its extensive discussion of this "any 2 member" approach was too fresh and too important for the legislature to have overlooked the issue. Although petitioners invite us to conclude otherwise, we must decline this invitation to judicial legislating. The legislature without doubt did not intend such a result. Given the history, given the impact on the enunciated policy of openness compatible with the conduct of government business, and given the ease with which the legislature could have accomplished applying the law to any gathering of two members or more, we cannot reach such a conclusion. Petitioner's invitation must be addressed to the legislature. If the Open Meeting Law with its notice requirements is to apply to any gathering of two or more public officials convened for the deliberate purpose of participating in formal or informal government business, the legislature must so state.

Neither did they choose triggering the statute by the presence of one-half of the group. That the legislature was aware of the power of one-half of a body is evident by the language of sec. 19.82, Stats., which creates a presumption of government business being conducted when one-half or more are present. It would have been an easy step to have simply said that the law is triggered by a "gathering of one-half or more members of a governmental body...." They did not do so. Other states had. The *Conta* court spoke at length to the power of one-half of the group. It was a major point in the brief of Goyke—a member of the two Conference Committees which shaped the language. Their failure to trigger the statute by such language could not have been an oversight. It had to be deliberate.

Neither did they choose, and in fact specifically rejected, triggering the statute by the presence of a quorum. This was the approach in the original senate version, Senate Bill 630, and it was rejected.

Third: That although the focus of the legislature was on the purpose of the gathering ["for the purpose of exercising the responsibilities, authority, power or duties...."] it is clear that the legislature did not intend that "purpose," standing alone, could trigger the statute. If purpose was the only trigger, then secs. 19.81–87, Stats., would apply to any gathering of even two members of a ninety-nine member body if the purpose of their meeting was to discuss governmental business. As discussed above, this is an approach the legislature intended to avoid.

Fourth: The legislature in enacting secs. 19.81–87, Stats., intended the law to apply, at least under some circumstances, to gatherings of less than one-half of the members of a governmental body. The legislative his-

tory, the language of the *Conta* decision, as well as common sense tells us this has to be the case. Legislative history reveals that one of the concerns, as expressed in the Legislative Reference Bureau Drafting Record, was evasion. As discussed above, the original Senate draft provided for triggering of the statute only when a quorum was present. It was rejected because it was felt that the quorum language "leaves an unfortunate loophole that might invite circumvention based on a narrow legal line instead of emphasizing the broad meaning of the law." The reasoning found in that objection is equally applicable to language that would have made the law apply only to gatherings of one-half the members or more.

In addition, the language in *Conta* regarding groups consisting of less than a quorum was before them:

> "It is certainly possible that the appearance of a quorum could be avoided by separate meetings of two or more groups, each less than quorum size, who agree through mutual representatives to act and vote uniformly, or by a decision by a group of less than quorum size which has the tacit agreement and acquiescence of other members sufficient to reach a quorum. Such elaborate arrangements, if factually discovered, are an available target for the prosecutor under the simple quorum rule." *Id.* at 687.

The legislature did nothing to step back from that conclusion found in *Conta*.

Common sense also tells us, and the Commissioners here agree, that if proxies are present so as to realistically make-up a majority, the Open Meeting Law applies.

Fifth: The legislature was concerned with the ability of a gathering to block passage of pending legislation.

Senator Goyke had pressed this point in his amicus brief to the *Conta* court. The court agreed with him. *Id.* at 687–88. Goyke was on the Conference Committee which drafted the bill, the language from which became secs. 19.81–87, Stats. A tie vote on a matter of pending legislation is a defeat of that proposal. It cannot become law. The recognition of that power could not and did not escape the legislature's attention: even the language giving rise to a presumption of governmental business uses the words "one-half or more," a clear recognition of the intent to reach the power to block.

The question remains as to how these conclusions affect determination of the "triggers" of the Open Meeting Law. To sum up, the legislature intended to broaden the scope of the Open Meeting Law from previous law, including *Conta*. In determining the trigger of the Open Meeting Law, the legislature rejected the "numbers" approach. In addition, purpose alone was insufficient to trigger the statute. Further, the legislature intended that under some circumstances the law would apply to gatherings of one-half or less. And last, the legislature's concern was not only with the power to pass proposals but also with the power to defeat them.

It is inescapable, given all the above, that the legislature intended *something* in addition to "purpose" in order to trigger the statute. If purpose alone were sufficient, the statute would apply any time two or more members gathered to discuss government business, a result the legislature clearly did not intend. What is this "something?" It cannot be some other number such as a quorum or one-half: the legislature rejected those approaches. It cannot be, as discussed above, the potential only to *pass* proposals. The only remaining "something" is the potential of a group to determine the out-

101

come of a proposal, whether that potential be the affirmative power to pass, or the negative power to defeat.

From this, we conclude that the trigger is twofold. First, there must be a purpose to engage in governmental business, be it discussion, decision or information gathering. Second, the number of members present must be sufficient to determine the parent body's course of action regarding the proposal discussed.

The burden of proving that a meeting of this nature occurred involving less than one-half of the total members rests with the party asserting the violation. Section 19.82(2), Stats., states in part: "If one-half or more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body." Given this statutory assertion, and the statutory silence with respect to meetings of less than one-half, it follows that the burden of proof involving meetings of less than one-half of the membership rests with the party asserting the violation.

We turn now to applying secs. 19.81–87, Stats., and our interpretation of that law, to the facts of this case. It is conceded that the purpose of the meeting of the four Commissioners was to discuss the pending capital budget. It was therefore a meeting "for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body." Section 19.82(2). It is conceded that passage of that proposal required a two-thirds vote. It is conceded that four members were

sufficient to defeat any proposal regarding the capital budget. Because the convening of these four members was for the purpose of exercising the responsibility, authority, power or duties of the body, i.e. the discussion of the capital budget, and because these four members had the potential to determine the outcome of any proposal regarding the capital budget, we hold that this meeting was subject in all respects to Wisconsin's Open Meeting Law.

The Commissioners argue that because they were from two opposite factions (two of them represented the city and two represented the suburbs), they were not in fact a "negative quorum." Their argument rests on the premise that these two factions would not in reality ever join together, and therefore would never be in a position to determine the outcome by voting together to defeat the proposal. We reject this argument in total. Whether a group of divergent forces would ever join together is simply not the issue. The fact is that there is always the potential, no matter how divergent the forces, to join together. The Open Meeting Law is concerned with the potential to determine the outcome, not with the likelihood that an alliance may or may not be formed. The legislature knew, as do these Commissioners, that politics makes strange bedfellows. Today's enemy may become tomorrow's ally. Shifting agendas and shifting alliances can and often do lead to unpredictable results and unlikely alliances. When a group of governmental officials gather to engage in formal or informal government business and that group has the potential to determine the outcome of the proposal or proposals being discussed, the public, absent an exception found within the law has the right to know—fully—the deliberations of that group. The public is entitled to no less.

Newspapers Inc. conceded at oral argument that this was not an appropriate case to impose a forfeiture. There is no allegation that these Commissioners committed a knowing or intentional violation of the law. From a review of the record we can discern none. The record reveals a hardworking, industrious Commission increasingly frustrated by its inability to pass a capital budget. A deadline loomed. The meeting was a good faith effort by Chairperson Showers to resolve the impasse. Notwithstanding these concerns, the public had rights of full access to that meeting. The relief requested by Newspapers Inc. is a declaration by this court that the closed meeting of the four Commissioners on December 1 violated Wisconsin's Open Meeting Law. It did. We reverse and direct that a declaratory judgment alone be entered in favor of the petitioners.

*By the Court.*—Decision of the court of appeals is reversed. Rights declared.