COURT OF APPEALS
DECISION
DATED AND FILED

March 23, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP433**

STATE OF WISCONSIN

Cir. Ct. No. **2019CV172**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN EX REL. HEATHER HOLMES
C/O THE LAKELAND TIMES,

PLAINTIFF-APPELLANT,

V.

CITY OF RHINELANDER CITY COUNCIL, ANDREW LARSON,
DAVID HOLT, STEVE SAUER, RYAN ROSSING AND CHRIS FREDERICKSON,

DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Oneida County: MICHAEL H. BLOOM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 SEIDL, J. Heather Holmes appeals from a judgment dismissing her complaint for failing to state a claim upon which relief could be granted. Holmes' complaint alleges that Rhinelander City Council members Andrew Larson,

David Holt, Steve Sauer, and Ryan Rossing (herein referred to as the "members") violated the Wisconsin Open Meetings Law, WIS. STAT. §19.83(1).[1] Specifically, Holmes alleges that through emails and personal meetings, those members formed a "walking quorum"—and thus they held a "meeting"—and took action to censure City Council president George Kirby without proper notice and a public hearing as required under § 19.83(1).

¶2 We conclude that Holmes' complaint fails to allege facts, as opposed to mere legal conclusions. In particular, the complaint does not allege sufficient facts to support Holmes' claim that the four members improperly conducted government business by agreeing to or voting on action to be taken regarding Kirby. Accordingly, the circuit court correctly determined that the complaint did not allege sufficient facts to show that the four members violated Wisconsin's Open Meetings Law, and we therefore affirm.

## BACKGROUND

¶3 In July 2019, Holmes filed the instant lawsuit against the Council, and Chris Frederickson, Rhinelander's mayor. The following factual allegations are taken from Holmes' complaint. Holmes is an employee of the local Lakeland Times newspaper. The Council is a "body politic" that governs the City of Rhinelander, a Wisconsin municipality. At the time of the events at issue in this appeal, the Council had a total of seven elected members or alderpersons, four of whom were Larson, Holt, Sauer and Rossing.[2] As mayor, Frederickson was a

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Although there were eight total aldermanic districts, there was a vacancy that was eventually filled by Lee Emmer who was not a council member at the time relevant to this appeal.

member of the Council for purposes of breaking tied votes, but was not counted when determining whether a quorum existed to conduct City business.

¶4  The allegations in Holmes' complaint flow from a January 28, 2019 Council meeting, in which Council member and president George Kirby refused to participate.  Kirby was upset that the Council had failed to place an item on the agenda regarding office furnishings purchased by city administrator Daniel Guild without approval from the Council.  Kirby's refusal to participate in the meeting resulted in the Council failing to meet the quorum required to conduct business.

¶5  Following the meeting, the members met in sub-quorum sized groups over the next several days to discuss Kirby's actions.  Those meetings culminated in the delivery of a letter to Kirby, which was signed by the members in their individual capacities as "fellow Council members."

¶6  Prior to the filing of the complaint, but after the letter was delivered to Kirby, the Division of Criminal Investigation within the Wisconsin Department of Justice (DOJ) investigated the members' actions.  As part of that investigation, all five of the letter's signatories subsequently gave interviews to law enforcement about the reasons for, and the events leading up to, the preparation of the letter.  A report concerning the investigation and its outcome was attached to the complaint as Exhibit 2.  The report contained the following facts that are relevant to Holmes' claims.

¶7  After the January 28, 2019 Council meeting, Holt discussed Kirby's actions with Frederickson.  Holt stated that he "was upset with Kirby's actions and said something about 'why can't we work together.'"  On January 28 or 29, Sauer, Rossing and Guild met to discuss "how to address Kirby" and what they would like Kirby to "know and think about."  Either Guild or Rossing wrote down their

3

thoughts at the meeting; however, Holmes' complaint alleges no affirmative facts relating to the contents of that writing.

¶8    Later that week, Holt spoke with Sauer in which Holt "vented his frustrations" about Kirby, stating that the Council president should better support the Council and that Kirby's actions were "embarrassing and hypocritical."  After the Council meeting, Holt asked Guild to add an item to the Council agenda regarding the president's position, although not specifically Kirby.  However, Holt subsequently retracted this request.

¶9    On January 30, 2019, Sauer went to Frederickson's house to socialize, but at some point they began to discuss Kirby.  While at Frederickson's house, Sauer received an email from Guild that contained a draft letter[3] to Kirby.  Sauer and Frederickson discussed the letter and later invited Rossing over for further discussion.  Sauer believes that Rossing called Guild to make a few modifications to the letter.  When Sauer received a second copy of the letter, he went home to print it.  Sauer then returned to Frederickson's house, and the three signed the letter.  Sauer told Frederickson and Rossing that he asked Larson and Holt to also sign the letter.

¶10    The next day, Holt met with Sauer and signed the letter.  On the same day, Guild sent an email to the members which attached an article from the "League of Municipalities" explaining how to remove a council president.  Around the same date, Rossing called Larson and stated that he and others had drafted a letter regarding Kirby's actions.  Larson later went to Sauer's house, read

---

[3] The author of the letter is unclear based on the record.  Regardless of the original author, the letter was ultimately signed by Larson, Holt, Sauer, Rossing, and Frederickson.

the letter, and signed it.  Thus, all four members and Frederickson signed the letter.

¶11    Holt subsequently hand delivered the letter—which was attached to Holmes' complaint as Exhibit 1—to Kirby.  The entire letter reads as follows:

> Dear George,
>
> We are writing to address the incident which occurred this past Monday night at the Common Council meeting.  We are struggling to understand your conduct when it appears to us there were so many preferable alternatives.
>
> From your public comments, we are aware of a disagreement between you and Administrator Daniel Guild.  Our questions include wanting to know why did you not reach out to the Mayor, and/or your fellow Council members about your concerns prior to the meeting?  Why did you choose not to seat yourself with us, allowing the official meeting to proceed, and then stating your concerns during public comment?  Even after being compelled by the Council to take your seat and perform your duties, both on behalf of your constituents, and to us, your colleagues, you made a conscious decision not to be seated, knowing it could, potentially, affect our ability to convene and conduct the City's business.
>
> Some of us are still unclear as to the reason behind your course of action.  You started to make a public statement, which we know you were not able to finish, due to the fact we were not convened into an official meeting.  Since then, many of us have not heard from you regarding these concerns, nor have we had any suggestion of your wanting to work with us to resolve them.  We have been able to read some [sic] your comments to local news reporters.  Why are you able to talk with reporters and not us, your fellow Council members, about your concerns?
>
> It is our thought that the City of Rhinelander is bigger than any one City employee, or any one elected official.  As a group, we have spoken about the expectations we have for each other as Council members.  We have recently discussed the need for us to talk with each other, first, before we create unnecessary drama, which impacts the City's reputation and the community's perception of us as a governing body.  Do you still agree with this principle?

Should we not try to work together to solve problems and attend to the business of the City[?]

Regardless of your motivations and intentions, this incident does not reflect the level of leadership we are looking for from a seasoned, experienced elected official, such as yourself. As our Council President, we look to you for that leadership and setting a standard of behavior and conduct for the rest of the Council. Some of us would like to inquire further if you feel you have the composure necessary to continue to serve as Council President. Given recent events, perhaps it would be more comfortable for you to not continue in this capacity?

This forthcoming conversation may be uncomfortable. It is not our intention for it to be so. As we have learned, as individuals, we cannot act on our own on behalf of the City. Rather it is the Common Council, as a group of elected officials, together, which has the authority to address problems.

It is our hope you would be willing to meet with us. It is our desire to resolve any issues swiftly and then return our attentions to the business of the City and moving the community forward.

¶12    Exhibit 2 to the complaint (the DOJ investigative report) further indicated that the signatories of the letter decided to sign it because it conveyed their concerns and questions and might "stir conversation" but did not "present a solution." The members reviewed guidelines prepared by the attorney general in order to ensure "there was no quorum" signing the letter and that there was no "pre-determined" or "expected" outcome from the letter apart from asking Kirby about his thoughts. The letter was intended "to ask Kirby questions," such as "[w]hat's going on?" and "how do we work together?" It represented an effort to try to get Kirby to discuss the situation with the Council members and "share his thoughts," and it was not asking Kirby to "step down." In short, the report stated that the signatories interpreted the letter as an "invitation" for Kirby to speak his

mind and recall prior agreements to "work together, and talk to each other," and "no decisions were made or addressed."

¶13 The members, Frederickson and the Council subsequently filed a motion to dismiss Holmes' complaint for failure to state a claim upon which relief could be granted, pursuant to WIS. STAT. § 802.06(2)(a)6. At a hearing on the motion, Holmes claimed the law enforcement interviews showed that the members met privately and considered matters concerning the "possible and actual censure and/or written reprimand" of Kirby and "potential further future action" against him.

¶14 The circuit court issued a written decision granting the defendants' motion. It concluded, as relevant to our opinion, that the investigatory reports did not support Holmes' allegations. The court reasoned that the facts alleged in Holmes' complaint did not establish: (1) "that the discussions among the defendants which culminated in their agreement to draft, sign and distribute the subject letter to Kirby were directed towards any proposition requiring a formal vote by the Common Council to implement"; (2) that the discussions "resulted in any agreement among the defendants to 'take a uniform course of action,' in their capacity as members of the Common Council, relative to any proposition requiring a formal vote by the Common Council to implement"; (3) "that the number of defendants that actually engaged in the discussions that culminated in the agreement to sign and distribute the letter to Kirby was sufficient to control formal Common Council action relative to same"; (4) "that the contents of the subject letter to Kirby addressed any proposition requiring a formal vote by the Common Council to implement"; and (5) "that the contents of the subject letter to Kirby manifested an agreement among the defendants to 'take a uniform course of action,' in their capacity as members of the Common Council, relative to any

proposition requiring a formal vote by the Common Council to implement." The court therefore concluded that Holmes' complaint failed to allege sufficient facts that, if true, would establish a violation of the open meetings law. This appeal follows.

## DISCUSSION

¶15    Holmes argues that the circuit court erred because the complaint contains allegations sufficient to establish a violation of the open meetings law. Whether a complaint fails to state a claim upon which relief can be granted is a question of law that we review de novo. *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶19, 284 Wis. 2d 307, 700 N.W.2d 180. We accept as true all well-pleaded facts in the complaint and the reasonable inferences drawn therefrom. *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693. However, we do not accord any weight or truth to legal conclusions alleged in a complaint. *Id.* If documents are attached to the complaint, we must consider them as part of the complaint. *Peterson v. Volkswagen of Am., Inc.*, 2005 WI 61, ¶15, 281 Wis. 2d 39, 697 N.W.2d 61. If the facts alleged in the complaint conflict with those contained in the attached documents, the contents of the attachments prevail over the complaint's averments. *Id.*

¶16    There is no dispute that the Council is a "governmental body" within the meaning of WIS. STAT. § 19.82(1) and that the Council must provide public notice in advance of a meeting and hold that meeting in open session as required by WIS. STAT. § 19.83(1). The main dispute here is whether the emails and personal meetings between the members and Frederickson leading up to the

8

transmittal of the letter to Kirby constituted a meeting under the open meetings law.

¶17   The term "meeting" is defined in WIS. STAT. § 19.82(2):

> "Meeting" means the convening of members of a governmental body *for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body*.  If one-half or more of the members of a governmental body are present, the meeting is rebuttably presumed to be for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body.  The term does not include any social or chance gathering or conference which is not intended to avoid this subchapter, any gathering of the members of a town board for the purpose specified in s. 60.50(6), any gathering of the commissioners of a town sanitary district for the purpose specified in s. 60.77(5)(k), or any gathering of the members of a drainage board created under s. 88.16, 1991 stats., or under s. 88.17, for a purpose specified in s. 88.065(5)(a).

(Emphasis added.)  In order to state a claim for an open meetings law violation, Holmes had to allege sufficient facts tending to show two elements: (1) "a purpose to engage in governmental business, be it discussion, decision or information gathering"; and (2) "the number of members present must be sufficient to determine the parent body's course of action regarding the proposal discussed."  *See State ex rel. Newspapers, Inc. v. Showers*, 135 Wis. 2d 77, 102, 398 N.W.2d 154 (1987).  The *Showers* court, however, clarified that the legislature did not intend to trigger the open meetings law "by automatically applying the law to any deliberate meetings involving governmental business between two or more officials."  *See id.* at 98.

¶18   In Holmes' brief, she contends the second part of the *Showers* test is met.  In support of her argument, she relies on *Showers* and *Lynch* for the proposition that a gathering that constitutes a quorum is presumed to be a violation

9

of the open meetings law. *Showers*, 135 Wis. 2d at 100; *State ex rel. Lynch v. Conta*, 71 Wis. 2d 662, 685, 239 N.W.2d 313 (1976), *superseded on other grounds by statute*. We do not perceive Holmes as alleging that the presumption in WIS. STAT. § 19.82(2) applies to the "walking quorum" at issue in this case. Additionally, we need not decide the presumption's application as we conclude that, regardless, there was no "purpose to engage in governmental business." *See Showers*, 135 Wis. 2d at 102.

¶19    In order to plead a business purpose for the meetings sufficient to survive a motion to dismiss, it is not enough to allege that there were communications between the members regarding their personal positions, or that they asked other members for their opinions. *See State ex rel. Zecchino v. Dane Cnty.*, 2018 WI App 19, ¶12, 380 Wis. 2d 453, 909 N.W.2d 203. Nor is it enough to show that the members read and signed a pre-meeting resolution or document if the document does not "discuss [] policy matters pending before the [body]" and "expressly commit[] the signatories" to vote in a particular way. *See* Wis. Op. Att'y Gen. Huff at 3 (2008), https://www.doj.state.wi.us/sites/default/files/dls/ompr/20080115-huff.pdf. Instead, the complaint must plausibly suggest that: (1) the members purposefully engaged in discussions regarding a specific measure of governmental business; and (2) these discussions "were held between a sufficient number of … members so as to affect the vote." *Zecchino*, 380 Wis. 2d 453, ¶11. An express or tacit agreement is required. *Id.*, ¶¶10, 12.

¶20    Regarding the first prong of the *Showers* test, the definition of "governmental business" is embedded in the WIS. STAT. § 19.82(2) definition of "meeting"—that is, "the convening of members of a governmental body *for the purpose of* exercising the responsibilities, authority, power or duties delegated to or vested in the body." (Emphasis added.) Here, Holmes argues the law

enforcement interviews incorporated into her complaint show the members discussed government business regarding "the effectiveness, possible and actual censure and/or written reprimand, and consideration of potential future further action against … Kirby," which amounted to a walking quorum sufficient to require notice of a public meeting. The Council had the authority to remove or suspend Kirby as president under WIS. STAT. § 17.12(1)(a) and (d). It also had authority under the City of Rhinelander Code to take one of two disciplinary actions against Kirby as Council president—that is, to fine him or to expel him for neglect of duty. *Compare* RHINELANDER, WIS., CODE § 2.02.01(1)(d), *with* § 2.01.18(8)(b) and (9).

¶21 Certainly, the Council removing, suspending, fining, expelling, censuring or reprimanding Kirby would involve governmental business. But, the question is whether Holmes' complaint alleges that the members convened a meeting for any of those purposes. Holmes contends that the members' actions culminated in a plan to reach an explicit agreement to prepare and sign a document calling Kirby's actions as a Council member into question, which, Holmes submits, effectively constituted a private reprimand.

¶22 We disagree. Holmes' allegation about the members reaching an explicit agreement is merely her own characterization of the members' discussions, and that characterization conflicts with the documents attached to her complaint. Again, if the facts alleged in the complaint conflict with those contained in the attached documents, the contents of the attachments prevail over the complaint's averments. *Peterson*, 281 Wis. 2d 39, ¶15.

¶23 The attachments to the complaint do not indicate that any of the members discussed censuring or reprimanding Kirby. Rather, the investigative

documents reveal the members met to discuss what happened at the prior Council meeting and questioned why Kirby acted in the manner he did. The documents further indicate that the members agreed to send an individually signed letter questioning Kirby's actions at the prior Council meeting and asking Kirby for his input on how to resolve their questions and concerns about his actions. The documents do not indicate that the members arrived at any agreement about what to do in response to Kirby's actions other than to ask what happened and why. The fact that the members read and signed a pre-meeting resolution or document does not constitute gathering for a business purpose under the open meetings law, if the document did not discuss policy matters pending before the body and expressly commit the signatories to vote in a particular way.

¶24    Holmes refers to the members discussing Kirby's "effectiveness." These discussions do not violate the open meetings law unless the members agreed on a uniform course of government action to take in response to their effectiveness discussions. *See Zecchino*, 380 Wis. 2d 453, ¶10. Here, the documents attached to Holmes' complaint show that the members identified the purposes of their questions to Kirby as trying to understand what motivated his actions at the meeting, to remind him of their agreement to work together, and to "stir conversation" in order for Kirby to think about his actions. The plain purpose of the letter was not to censure or reprimand Kirby or to "kick out Kirby," as the complaint claims.

¶25    Our supreme court has held that "[w]hen the members of a governmental body gather ... and then intentionally expose themselves to the decision-making process on business of their parent body—by the receipt of evidence, advisory testimony, and the views of each other—an evasion of the [open meetings] law is evidenced." *Lynch*, 71 Wis. 2d at 685-86. While Holmes'

12

complaint may be construed as alleging that the members met and received "the views of each other," it cannot be construed as alleging that the members received "evidence" or "advisory testimony" against Kirby. The use of the conjunctive "and" means that the supreme court in *Lynch* intended that there be more than just the receipt of "the views of each other" to constitute the conduct of governmental business under the open meetings law. Rather, *Lynch* clearly envisions a deliberative process much as would occur at a properly noticed meeting, including meeting for a proper governmental purpose.

¶26 The *Lynch* court further explained:

> To impose open session requirements on all government business discussion between at least two members of the same body, merely on the basis that such discussion somewhat enhances the possibility that mutual interests will be furthered and possibly carried out in the form of some future official action, would virtually impede much of the preliminary labor involved in any government action and thus be incompatible with the necessary "conduct of governmental affairs and the transaction of governmental business."

*Id.* at 689. Here, the complaint's allegations demonstrate that the discussions between the members fall squarely within this articulation of the scope of the open meetings law.

¶27 This court's decision in *Zecchino* is also instructive. There, Zecchino's business, Adams Outdoor Advertising, leased three billboards near the Dane County Regional Airport. *Zecchino*, 380 Wis. 2d 453, ¶2. Prior to the lease's expiration on December 31, 2015, the Dane County airport commission, the public works committee, and the personnel and finance committee all voted in support of renewing Adams' billboard lease. *Id.* On April 7, 2016, however, the county board rejected the lease in an eighteen to sixteen vote. *Id.*

13

¶28    Adams then brought an action alleging a violation of the open meetings law through an illegal walking quorum and relief seeking a declaration that the board's April 7, 2016 decision was unlawful. *Id.*, ¶3. Adams' complaint alleged that prior to the April 7 vote, a number of board members engaged in closed discussions with the purpose of negatively affecting the vote on the lease. *Id.* Specifically, the complaint alleged that board supervisor Paul Rusk emailed multiple other board supervisors prior to the vote and that he tried to call another supervisor to discuss her vote. *Id.*

¶29    After setting forth the details of Rusk's emails, this court observed that the entire factual basis for Adams' complaint was the series of emails sent by Rusk either to other board supervisors or to constituents. *Id.*, ¶12. Adams' argument relied primarily on Rusk's emails indicating that he was trying to "keep[] track" of the votes and emails to other supervisors in which Rusk expressed discontent with the billboards. *Id.* Most of Rusk's emails were one-way messages, garnering few, if any, responses from other supervisors. *Id.* None of the emails reflected a "tacit agreement" between the defendants to vote against the lease. *Id.* The emails all either dealt with scheduling matters, were communications with constituents, asked other supervisors for their opinions, or expressed Rusk's personal position. *Id.*

¶30    In affirming the circuit court's dismissal of Zecchino's complaint for failure to state a claim upon which relief could be granted, this court held:

> The essential feature of a "walking quorum" is the element of agreement among members of a body to act uniformly in sufficient numbers to reach a quorum. Where there is no [] express or tacit agreement, exchanges among separate groups of members may take place without violating the open meetings law. The signing, by members of a body, of a document asking that a subject be placed on the agenda of an upcoming meeting thus does not constitute a "walking

14

> quorum" where the signers have not engaged in substantive discussion or agreed on a uniform course of action regarding the proposed subject.

*Id.*, ¶10.

¶31 As in *Zecchino*, Holmes' complaint does not allege any express or tacit agreement among the members to take any action against Kirby other than to deliver a letter to him expressing their frustration with his refusal to participate in the Council meeting. Holmes' complaint clearly fails to allege that the members engaged in substantive discussion or agreed on a uniform course of action regarding removing, suspending, fining, expelling, censuring or reprimanding Kirby, or any other governmental business for that matter. Rather, in the words of the *Lynch* court, the members' discussion may have "somewhat enhance[d] the possibility that mutual interests [would] be furthered and possibly carried out in the form of some future official action." *See Lynch*, 71 Wis. 2d at 689. That, however, does not constitute a meeting at which governmental business was conducted under the open meetings law.

¶32 Instead, the members agreed to individually sign and deliver to Kirby a letter relating to his recent actions as Council president at an attempted Council meeting. Without more, it cannot be said that the members agreed on a "uniform course of action" on behalf of the Council. *See Zecchino*, 380 Wis. 2d 453, ¶10. The letter merely asked Kirby what was going on and if he would provide input on how to resolve the issue. The open meetings law does not apply to mere "discussions or brainstorming of a tentative nature preliminary to focusing on a specific outcome." *See* 68 Wis. Op. Att'y Gen. 171, 175 (1979), https://www.doj.state.wi.us/sites/default/files/dls/ompr/19860428-clifford.pdf.

This is precisely what occurred here. Therefore, the allegations in Holmes' complaint fail the first prong of the ***Showers*** test.

¶33 For the foregoing reasons, we conclude Holmes' complaint failed to allege sufficient facts that, if true, would demonstrate a violation of the open meetings law. We therefore affirm the circuit court's judgment dismissing Holmes' complaint.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.