¶ 1.
MICHAEL J. GABLEMAN, J.
This case requires us to decide whether the Appleton Area School District's Communications Arts 1 Materials Review Committee ("CAMRC") was a governmental body subject to Wisconsin's open meetings law. John Krueger, the parent of a child who attended school in the District, sued CAMRC and the Appleton Area School District Board of Education (the "Board"), alleging that CAMRC failed to comply with the open *245 meetings law. The Outagamie County circuit court[1] granted summary judgment in favor of the Board and CAMRC, concluding that CAMRC was not subject to the open meetings law. We now review the unpublished decision of the court of appeals[2] that affirmed the circuit court's grant of summary judgment.
¶ 2. We reverse the decision of the court of appeals and hold that CAMRC met the definition of "governmental body" under the open meetings law and therefore was subject to its terms. See Wis. Stat. § 19.82(1) (2011-12).[3] Where a governmental entity adopts a rule authorizing the formation of committees and conferring on them the power to take collective action, such committees are "created by. . . rule" under § 19.82(1) and the open meetings law applies to them. Here, the Board's Rule 361 provided that the review of educational materials should be done according to the Board-approved Assessment, Curriculum, & Instruction Handbook (the "Handbook"). The Handbook, in turn, authorized the formation of committees with a defined membership and the power to review educational materials and make formal recommendations for Board approval. Because CAMRC was formed as one of these committees, pursuant to authority delegated to it by the Board by means of Rule 361 and the Handbook, it was "created by . . . rule" and therefore was a "governmental body" under § 19.82(1).
*246 ¶ 3. We begin by setting forth the relevant factual background surrounding the District's rules governing curriculum review and the formation and operation of CAMRC.[4] We next analyze the statutory criteria that an entity must meet in order to be a "governmental body" subject to the open meetings law. We then apply these criteria to CAMRC, and we conclude that it was a "governmental body" under Wis. Stat. § 19.82(1) and therefore was subject to the open meetings law.
I. BACKGROUND
A. The District's Rules Governing Curriculum Review
¶ 4. Under the Wisconsin statutes, a school board is vested with the authority to "adopt all the textbooks necessary for use in the schools under its charge." Wis. Stat. § 118.03(1). In the Appleton Area School District, the Board adopted Rule 361,[5] which recognized that the Board, "as the governing body of the School District, is legally responsible for all educational materials utilized within the instructional program of the [District]." Rule 361 further provided that "[t]he selection of educational materials is delegated to the professionally trained and certified personnel em *247 ployed by the school system." In a section titled "Procedures for Selection of Educational Materials and Textbooks," Rule 361 provided that "[c]urriculum revision is an ongoing process as defined in the Board approved Appleton Area School District (AASD) Assessment, Curriculum, & Instruction Handbook. This Handbook delineates the processes leading to Board approval for curriculum revision, adoption of new courses, and implementation of curriculum materials." The Handbook had been developed by the District's Assessment, Curriculum, and Instruction Department (the "ACI Department") and presented to the Board for approval. The Board had voted to adopt the Handbook on January 13, 2003.
¶ 5. By providing in Rule 361 that the selection of educational materials was delegated to the ACI Department and by adopting the Handbook to govern the performance of those duties, the Board directed the ACI Department to follow the Handbook when recommending educational materials for Board approval. The head of the ACI Department, Kevin Steinhilber, acknowledged this in his deposition.[6] Rule 361 did not prohibit the ACI Department from revising the Handbook or modifying Handbook procedures to fit different situations.[7] But Rule 361 nevertheless represented the *248 Board's formal authorization for the ACI Department to review and recommend educational materials for Board approval pursuant to the processes in the Handbook.
¶ 6. The Handbook provides that curriculum review is to be performed on a 6-year cycle, on a course-by-course basis, by committees formed for that purpose.[8] As the Board and CAMRC explained in their responses to Krueger's discovery requests,
The curriculum cycle, as set forth in the ACI Handbook, contemplates the formation of committees for program and course review, including provisions for the committee makeup, application process for committee membership, information to be provided to committee members, the process for conducting committee meetings, and the expected outcomes to be achieved by review committees. . . .
Review committees are tasked with duties such as reviewing existing curriculum, reviewing possible materials/resources to support the curriculum, and writing course and program curriculum.. . .
[Ultimately,] the curriculum recommendations are presented to the Board of Education for approval.
Indeed, the Handbook provides that the first step when beginning a curriculum review cycle is to "[establish a committee for program review." The Handbook further provides that review committees are to be composed of at least 17 individuals:
*249 ACI Director/Coordinator; Administrators from High School (1), Middle School (1) and Elementary School (3); Teachers - High School Curriculum Support Specialists (3), Middle School Curriculum Support Specialists (4), and Elementary School (3); Special Education representative; and as pertinent TAG, Title I and ELL.
The ACI Department is supposed to select the members of the review committee by soliciting and reviewing applications from interested persons and sending the selected members "letters of acceptance with information regarding [the] first meeting."
¶ 7. After a review committee is formed, the Handbook authorizes the committee to perform a number of functions, including "identify[ing] possible materials/resources." Ultimately, the "committee makes the selection" of which materials or resources to recommend to the Board. The process culminates in presenting these recommendations to the Board for its approval. The Board and CAMRC, in their discovery responses, provided the following summary of the duties and functions assigned by the Handbook to be performed by review committees:
It is not until a review committee has: (1) identified texts/materials costs; (2) revised curriculum with broad representation throughout the District; (3) identified essential learning objectives; (4) identified how standards will be addressed within a course; (5) identified/developed district-wide assessments to benchmark major standards; (6) provided curriculum to department, administrators, and ACI Department for feedback; (7) made needed adjustments; (8) suggested implementation strategies for the following school year; and (9) curriculum documents [are] reviewed by the content steering committee, that the *250 curriculum recommendations are presented to the Board of Education for approval.
All of these provisions in the Handbook demonstrate that, as the Board and CAMRC put it in their discovery responses, the "Handbook provides the basis of authority for review committees, such as CAMRC," to exist.
B. Krueger's Request and the Formation of CAMRC
¶ 8. In July of 2011, Krueger asked the District to create an alternative Communications Arts 1 course that would use a different reading list, consisting of materials at a ninth grade reading level with no profanities, obscenities, or sexualized content. At the time of Krueger's request, the Communications Arts course curriculum had not gone through the Handbook's review-committee process in approximately eight years. In light of the standard six-year cycle, the Communications Arts curriculum was approximately two years overdue for a review.
¶ 9. District officials met with Krueger and told him that they were planning to begin the review process for Communications Arts in grades 7 through 12 in about a year and a half. They hoped that the new book list that would come out of the upcoming review process would meet Krueger's request, and a new course would not be necessary. Krueger was dissatisfied with the long timeline, and District officials reconsidered. They decided to go ahead and begin the review-committee process authorized in the Handbook, but only as to the book list for the Communications Arts 1 course. The book list needed updating anyway, in light of the new Common Core standards. As Steinhilber explained in his deposition, "we talked internally after that meeting" with Krueger and "de *251 termined that, well, knowing what we know about common core and needing those non-fiction materials, that we could adjust and do a modified version now knowing that we would go through a full curriculum process in the future."
f 10. Steinhilber worked with Nanette Bunnow, the District's Director of Humanities, to form CAMRC for this purpose. Bunnow testified in her deposition that, when forming CAMRC, "We used the process that was in place through [Rule] 361.1 in the Handbook in a modified process." Although Krueger's request was the impetus for forming CAMRC, it was undisputed that CAMRC was formed as a review committee pursuant to a modified version of the Handbook process.[9] According to Bunnow, the process was modified in that "we only looked at the book list" rather than reviewing and rewriting the full curriculum, "because the concern that was brought forth was related to the materials. We were not in a full curriculum cycle." Nonetheless, Bunnow said, "Superintendent Allinger was interested in us doing a full review [of the materials] because they hadn't been reviewed for eight years prior." The purpose of following the Handbook process for review committees, Bunnow explained, is "to make sure that we're all following a similar process no matter which curriculum [is being reviewed]." When asked to confirm that CAMRC derived its authority and functions from Rule 361 and the Handbook (and not from anywhere else), Bunnow agreed.[10]
*252 ¶ 11. In forming CAMRC, Steinhilber and Bun-now "sought members the same way as we have in the past" when forming other review committees pursuant to the Handbook. "In our handbook," Bunnow testified, "we have a process where we advertise or have applications that go out and say that we are currently seeking teachers . . . that are stakeholders in the curriculum, either teach it, or have taught it, or have some knowledge related to the intent of the committee." As a result of Bunnow's solicitations, 17 people came forward and were selected for membership on CAMRC. The 17 members included eleven teachers, three Communications Arts Curriculum Support Specialists, one Library Media Specialist, and one high school principal. Bunnow herself served as chair of the committee.
C. The Functions and Operation of CAMRC
f 12. CAMRC held its first meeting on Monday, October 3, 2011, and the full committee met a total of eight times, always on a Monday at 3:45 p.m. in the same location. Although CAMRC did not revise the entire curriculum for Communications Arts, CAMRC performed many of the other functions that the Handbook assigns to review committees. It identified a list of 93 potential books for the course, it reviewed them in light of course standards, it put a proposed list out for *253 public input, and it voted on which books to include. CAMRC arrived at a final list of two dozen books to recommend to the Board. All of these steps were taken in accord with duties assigned to review committees by the Handbook.
¶ 13. At that point in the process, Bunnow testified, "[w]e finished up the process as designed. We took it as an item for consideration to the Board." The book list was presented to the Board's Programs and Services Committee, which voted to approve the list and bring it before the full Board. The full Board voted to approve the list on April 23, 2012. Bunnow confirmed in her testimony that this "process was authorized through [Rule] 361.1 and the ACI Handbook."
¶ 14. The Board, too, understood CAMRC to be following the Handbook process for review committees. Shortly after CAMRC was formed, Bunnow and Stein-hilber had brought an "item of information" before the Board explaining that they had created CAMRC under a modified version of the Handbook's review-committee process to review the book list for Communications Arts 1. The Board had an opportunity to ask questions or to request a vote if it did not approve of the modifications to the review-committee process for CAMRC. Diane Barkmeier, a member of the Board, testified that her understanding was that CAMRC was "part of the curriculum and materials review process." Recalling the Board's approval of CAMRC's recommendations for the Communications Arts 1 book list, Bark-meier testified:
Q: So •— But what the Board, in essence, sets up here is procedures under the rule and under the handbook that review committees like CAMRC are supposed to follow as they formulate the recommendations to the Board, correct?
*254 A: Correct. . . .
Q: And then CAMRC comes to the full Board on April 23, 2012, to see if you'll adopt the recommendations at the suggestion of the committee, right?
A: Correct.
Q: And you voted to adopt the recommendations of CAMRC as the new educational materials for the district, right?
A: We did .... As a Board.
Q: And all of that process is the process set forth in rules 361 or 361.1 and the ACI Handbook, right?
A: Right.
I 15. In short, every school official involved in the process (including the Board, the Superintendent, and Steinhilber and Bunnow) understood CAMRC to have been extant pursuant to the authority of Rule 361 and the Handbook as approved by the Board, for the purpose of performing the delegated functions of reviewing curriculum materials and presenting them for Board approval.
D. Procedural History
¶ 16. Although it was Krueger's request that spurred District officials to form CAMRC pursuant to a modified version of the Handbook process to review the Communications Arts 1 book list, the District did not permit Krueger to attend CAMRC meetings. He asked to attend, but the District denied his request and informed him that CAMRC meetings were not open to the public. The District took the position that the open meetings law did not apply to CAMRC.
*255 f 17. On July 29, 2013, Krueger filed a complaint in Outagamie County circuit court, alleging violations of the open meetings law.[11] The Board and CAMRC moved for summary judgment, and the circuit court granted their motion.
f 18. Krueger appealed, and the court of appeals affirmed. The court of appeals considered it dispositive that CAMRC was created by District officials in response to Krueger's request, rather than by the Board directly. Krueger, unpublished slip op., ¶¶ 18-21. The court of appeals relied on the fact that Rule 361 did not expressly create CAMRC and that nothing in the Handbook mandated that CAMRC, specifically, be created. See id., ¶ 7. The court of appeals viewed CAMRC as an ad hoc group of government employees rather than as a governmental body that was subject to the open meetings law.
¶ 19. Krueger petitioned this court for review, which we granted on October 11, 2016.
II. STANDARD OF REVIEW
¶ 20. At issue in this case is whether the lower courts properly interpreted and applied the open meet *256 ings law in granting summary judgment to the Board and CAMRC. This is a question of statutory interpretation for our independent review. Journal Times v. City of Racine Bd. of Police and Fire Comm'rs, 2015 WI 56, ¶ 42, 362 Wis. 2d 577, 866 N.W.2d 563. "When a circuit court's ruling on motions for declaratory judgment depends on questions of law, we review the ruling de novo." Gister v. Am. Family Mut. Ins., 2012 WI 86, ¶ 8, 342 Wis. 2d 496, 818 N.W.2d 880. We review questions of law "independently of the circuit court and court of appeals but benefiting from their analyses." State v. Popenhagen, 2008 WI 55, ¶ 32, 309 Wis. 2d 601, 749 N.W.2d 611.
III. DISCUSSION
A. The Definition of a "Governmental Body"
¶ 21. Wisconsin's open meetings law begins by declaring that "the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business." Wis. Stat. § 19.81(1). Toward that end, the law requires that every meeting of a "governmental body" be preceded by public notice and kept open to the public, except where a statutory exception authorizes the body to meet in closed session. See generally Wis. Stat. §§ 19.81-19.85.
¶ 22. Our focus today is on the threshold question of when the open meetings law applies. An entity is subject to the open meetings law if it is a "governmental body" as defined in Wis. Stat. § 19.82(1). The statute provides, in relevant part, that"' [governmental body' means a state or local agency, board, commission, committee, council, department or public body *257 corporate and politic created by constitution, statute, ordinance, rule or order... or a formally constituted subunit of any of the foregoing ...."§ 19.82(1).[12]
¶ 23. This definition imposes certain requirements, including the requirement that the entity must take one of seven forms: a "state or local agency, board, commission, committee, council, department or public body corporate and politic." Wis. Stat. § 19.82(1). The adjectives "state or local" modify each item on this list,[13] indicating that the entity must be a part of either state or local government. The entity must also be "created by constitution, statute, ordinance, rule or order." Id. Taken together, these provisions define a *258 "governmental body" not by the purpose behind its formation or by the subject matter of its meetings, but simply by two criteria: (1) the form it takes and (2) the source of its existence in a constitution, statute, ordinance, rule, or order.
¶ 24. First, a governmental body must take the form of a "state or local agency, board, commission, committee, council, department or public body corporate and politic." Wis. Stat. § 19.82(1). We gain additional insight into what this requires from other parts of the open meetings law. In particular, we note that a "meeting" of a governmental body is defined as "the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body." § 19.82(2). This implies that a governmental body must have a defined membership, because without clarity as to who is and who is not a member, it could be impossible to determine when a sufficient number of members is assembled to constitute a "meeting" of the body. See State ex rel. Newspapers, Inc. v. Showers, 135 Wis. 2d 77, 102, 398 N.W.2d 154 (1987) (holding that a meeting of a governmental body does not occur unless "the number of members present [is] sufficient to determine the parent body's course of action"). Further, the statutory definition of "meeting" states that particular responsibilities, authority, power or duties must be delegated to or vested in the body, as distinct from the members individually. Wis. Stat. § 19.82(2); see State ex rel. Lynch v. Conta, 71 Wis. 2d 662, 681, 239 N.W.2d 313 (1976) (noting that a necessary characteristic of a governmental body is that "collective power" has been conferred upon it).
*259 ¶ 25. Second, the governmental body must be "created by constitution, statute, ordinance, rule or order." Wis. Stat. § 19.82(1). In the general sense of the word, to "create" means to "cause to exist; bring into being." Create, American Heritage Dictionary 438 (3d ed. 1992). In light of this definition, there must be a constitutional provision, statute, ordinance, rule, or order that caused a governmental body to exist where none existed before. In order to cause a body to exist, the relevant directive must confer upon it the collective "responsibilities, authority, power or duties" that are necessary to a governmental body's existence under the open meetings law. See 78 Wis. Op. Att'y Gen. 67, 69 (1989) (OAG 13-89) ("The board would, therefore, be creating a committee by order whenever it authorizes the committee and assigns the duties and functions of the committee.").[14]
¶ 26. For these reasons, the creation of a governmental body is not triggered merely by "any deliberate meetings involving governmental business between two or more officials." Showers, 135 Wis. 2d at 98. Loosely organized, ad hoc gatherings of government employees, without more, do not constitute governmental bodies. See 57 Wis. Op. Atty. Gen. 213, 216 *260 (1968) (explaining that "meetings between the [] head of a department and . . . the entire staff of a department" were not covered by the former version of the open meetings law "because the staff does not constitute a body"). Rather, an entity must exist that has the power to take collective action that the members could not take individually. See id. at 218 (concluding that the faculty of a state university was a body covered by the former version of the open meetings law, in part because, under the "faculty handbook, constitution and bylaws, . . . the structure of that faculty body does indeed provide for the taking of formal actions, as a body, with regard to delegated policy-making and administrative functions.") As this court has succinctly put it, "the question of whether a particular group of members of the government actually compose a governmental body is answered affirmatively only if there is a 'constitution, statute, ordinance, rule or order' conferring collective power and defining when it exists." Conta, 71 Wis. 2d at 681.
B. CAMRC Was a "Governmental Body"
¶ 27. Applying these principles, we conclude that CAMRC was a committee created by rule under Wis. Stat. § 19.82(1). First, it qualifies as a "committee" for purposes of the open meetings law because it had a defined membership of 17 individuals upon whom was conferred the authority, as a body, to review and select recommended educational materials for the Board's approval. This authority to prepare formal curriculum recommendations for Board approval was not exercised by teachers and curriculum specialists on their own. The Board — acting through Rule 361 and the Handbook — provided that the members of review committees would exercise such authority collectively, as a *261 body. Second, CAMRC was created by rule because District employees, when they formed CAMRC, relied on the authority to form review committees that was delegated to them by Rule 361 and the Handbook.
1. CAMRC Was a "Committee"
¶ 28. The parties appear to agree that CAMRC took the form of a "committee" for purposes of the open meetings law, and they focus their dispute instead on the second part of the definition. But we are not bound by the parties' concessions. See State v. Hunt, 2014 WI 102, ¶ 42 n.11, 360 Wis. 2d 576, 851 N.W.2d 434. We therefore briefly explain why we agree that CAMRC was a "committee" under Wis. Stat. § 19.82(1).
f 29. First, CAMRC was formed as a collective entity with a defined membership of 17 particular individuals. Although these individuals volunteered, and Bunnow suggested that more would have been welcome to join, the 17 nevertheless constituted a defined membership selected pursuant to the procedures set forth in the Handbook. Bunnow testified that all 17 members were present and voting at all CAMRC meetings, except for a final meeting which Bunnow characterized as merely a "subcommittee" meeting.
¶ 30. Nor was CAMRC simply a loosely organized, ad hoc gathering of employees meeting to share knowledge or to facilitate their existing job duties. As members of CAMRC, the 17 teachers, curriculum specialists, and others were meeting to fulfill a collective responsibility that Rule 361 and the Handbook had assigned to review committees, namely, the responsibility to review the book list for the Communications Arts 1 course and to recommend revisions to *262 that book list to the Board for formal approval. The Board-approved Handbook vested review committees such as CAMRC with the power to "identify possible materials/resources" and ultimately "make[] the selection" of which materials or resources should be recommended to the Board. None of the teachers or curriculum specialists on CAMRC would have had this authority individually but as members of CAMRC, they were empowered to vote on how CAMRC should exercise its collective authority as a body.
f 31. That CAMRC called itself a "committee," kept minutes, and recorded attendance and votes are informative, but not dispositive, facts. The essential elements of the form that an entity must take in order to be a governmental body are (1) a defined membership and (2) collective responsibilities, authority, power, and duties vested in the body as a whole, distinct from the individual members. CAMRC met both of these elements, and therefore we have no difficulty concluding that it was a "committee" under the definition in Wis. Stat. § 19.82(1).
2. CAMRC Was Created By Rule
¶ 32. We conclude that CAMRC was created by rule, because Rule 361 and the Handbook together constituted a "rule" under Wis. Stat. § 19.82(1) that authorized CAMRC to exist and conferred collective authority on it.
¶ 33. The open meetings law does not define the term "rule," so we look to its common usage. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special *263 definitional meaning." State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. The common definition of a "rule" includes "[a]n authoritative, prescribed direction for conduct, especially one of the regulations governing procedure in a legislative body." Rule, American Heritage Dictionary 1577 (3d ed. 1992).[15] We see no indication in the open meetings law that "rule" should be given a peculiar technical meaning instead of being "liberally construed" along with the rest of the open meetings law. See Wis. Stat. § 19.81(4). Therefore, for purposes of the open meetings law, we conclude that a "rule" includes any authoritative, prescribed direction for conduct, such as the regulations governing procedure in a governmental body.[16]
¶ 34. Here, Rule 361 and the Handbook constituted a "rule" because they were adopted by the Board to prescribe the procedures for District employees to follow in reviewing educational materials and presenting them to the Board for approval. Specifically, Rule *264 361 provided that "[t]he selection of educational materials is delegated to the professionally trained and certified personnel employed by the school system" and that the Board-approved "Handbook delineates the processes leading to Board approval for curriculum revision, adoption of new courses, and implementation of curriculum materials." The processes set forth in the Handbook specifically provided for the creation of review committees for this purpose. As the Board and CAMRC stated in their discovery responses, "Review committees are tasked with duties such as reviewing existing curriculum, reviewing possible materials/resources to support the curriculum, and writing course and program curriculum." Ultimately, "the curriculum recommendations are presented to the Board of Education for approval."
¶ 35. Therefore, Rule 361 and the Handbook authorized CAMRC to exist and conferred on it the collective authority to review curriculum materials and make a recommendation to the Board. Steinhilber and Bunnow simply put the Handbook process into action when they formed CAMRC to review the book list for Communications Arts 1. As Bunnow testified, "[w]e used the process that was in place through [Rule 361] in the Handbook in a modified process." Although Bunnow and Steinhilber modified the Handbook process somewhat, in that CAMRC reviewed only the book list "because the concern that was brought forth was related to the materials," Steinhilber agreed that CAMRC was a review committee operating under the Handbook, and Bunnow similarly agreed that Rule 361 and the Handbook provided the sole authority for CAMRC to exist.
¶ 36. Underscoring the nature of the rule under which CAMRC was formed is the fact that, after *265 forming CAMRC, Bunnow went before the Board to explain how the Handbook procedures had been modified to create CAMRC. The Board had a chance to ask questions, and it permitted CAMRC to continue. Bark-meier, a member of the Board, testified that she understood CAMRC to be "part of the curriculum and materials review process." Bunnow testified that CAMRC "finished up the process as designed" when it ultimately presented its recommended book list to the Board for approval, and this "process was authorized through [Rule 361] and the ACI Handbook."
¶ 37. Accordingly, we conclude that CAMRC was created by Rule 361 and the Handbook, because even though it was Steinhilber and Bunnow who put the Handbook process into action when they formed CAMRC, it was the Board's Rule 361 and the Board-approved Handbook that authorized review committees like CAMRC to be created and conferred on them the collective authority to review curriculum materials and make recommendations to the Board.
f 38. The court of appeals reached the opposite conclusion, reasoning that neither Rule 361 nor the Handbook "created" CAMRC because CAMRC "was not created based on any specific provision of either" Rule 361 or the Handbook. Krueger, unpublished slip op., ¶ 7. The court found it dispositive that CAMRC was formed not by a directive of the Board but by Steinhilber and Bunnow, acting "on their own initiative" and "borrowing] concepts from Board Rule 361.1 and the ACI Handbook." Id., ¶¶ 7, 21.
¶ 39. In light of the extensive testimony about how CAMRC was understood to be one of the review committees authorized by the Board through Rule 361 and the Handbook — albeit using a somewhat modified process — we do not find the court of appeals' distinc *266 tion persuasive. We agree with the Attorney General's opinion that a committee is created whenever a governmental body, by rule, "authorizes the committee and assigns the duties and functions of the committee." See 78 Op. Att'y Gen. 67, 69 (1989) (GAG 13-89). Here, it was the Board's Rule 361 and the Board-approved Handbook — not a directive from Steinhilber or Bunnow — that provided the legal authority for CAMRC to exist and set forth CAMRC's duties and functions. Although the Handbook did not specifically constitute CAMRC by name, it authorized review committees like CAMRC to exist and to exercise the Board's delegated authority over curriculum review. It was that authority that Steinhilber and Bunnow relied on when they formed CAMRC to review the Communications Arts 1 book list.
¶ 40. For the same reason, the fact that CAMRC did not follow all Handbook procedures to the letter is not dispositive. For example, the Handbook provided for the members of a review committee to include five administrators (one each from a high school and a middle school and three from an elementary school). By contrast, CAMRC included only one high school administrator, and it otherwise consisted of teachers and curriculum support specialists, along with a library media specialist. However, Bunnow and Stein-hilber testified that the Handbook process was adjustable depending on the purpose of the particular review committee, and the membership of review committees often varied. Here, CAMRC was tasked with reviewing the book list for a particular class and making recommendations to the Board, and if it served that goal to have a greater proportion of teachers on the committee, along with a library media specialist, the Handbook did not prohibit such modifications. In no way did *267 the composition of CAMRC affect its authority to act as a review committee under Rule 361 and the Handbook.
¶ 41. Krueger also argues, in the alternative, that CAMRC was created by "order" of Steinhilber or Bunnow. The court of appeals held that this argument was forfeited because it first appeared in Krueger's reply brief. On appeal, Krueger renews this argument, but we need not resolve it because we hold that CAMRC was created by rule under Rule 361 and the Handbook. Krueger's arguments as to why CAMRC might alternatively have been created by "order" do nothing to disturb our conclusion.
f 42. Finally, the Board and CAMRC argue that subjecting committees like CAMRC to the open meetings law would be detrimental to the functioning of government. But our task is to apply the open meetings law as it is written. If the District "seeks change in the statutory provisions [of the open meetings law], it must direct those concerns to the legislature." Journal Times, 362 Wis. 2d 577, ¶ 52. We, however, "presum[e] that the legislature chose its terms carefully and precisely to express its meaning," Ball v. Dist. No. 4, Area Bd. of Vocational, Technical & Adult Educ., 117 Wis. 2d 529, 539, 345 N.W.2d 389 (1984), and we are not at liberty to exempt CAMRC from the definition of "governmental body" simply because government officials would find it convenient. "Mere government inconvenience is obviously no bar to the requirements of the [open meetings] law." Conta, 71 Wis. 2d at 678.
IV. CONCLUSION
¶ 43. For all of these reasons, we reverse the decision of the court of appeals and hold that CAMRC was a "state or local. . . committee . . . created by . . . *268 rule" and therefore met the definition of "governmental body" under the open meetings law. See Wis. Stat. § 19.82(1). Where a governmental entity adopts a rule authorizing the formation of committees and conferring on them the power to take collective action, such committees are "created by . . . rule" under § 19.82(1) and the open meetings law applies to them. Here, the Board's Rule 361 provided that the review of educational materials should be done according to the Board-approved Handbook. The Handbook, in turn, authorized the formation of committees with a defined membership and the power to review educational materials and make formal recommendations for Board approval. Because CAMRC was formed as one of these committees, pursuant to the authority delegated from the Board by Rule 361 and the Handbook, it was "created by . . . rule" and therefore was a "governmental body" under § 19.82(1).
By the Court. — The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.
*269 APPENDIX A
[[Image here]]
*270 [[Image here]]
*271 [[Image here]]
*272 [[Image here]]
*273 [[Image here]]
*274 [[Image here]]
*275 [[Image here]]
*276 APPENDIX B
[[Image here]]
*277 [[Image here]]
*278 [[Image here]]
*279 [[Image here]]

 The Honorable Vicki L. Clussman, presiding.

 State ex rel. Krueger v. Appleton Area Sch. Dist. Bd. of Educ., No. 2015AP231, unpublished slip op. (Wis. Ct. App. June 28, 2016).

 All subsequent references to the Wisconsin Statutes are to the 2011 — 12 version unless otherwise indicated.

 As the court of appeals recognized, the parties have agreed that there are no disputed issues of material fact. Krueger, unpublished slip op., ¶ 2 n.1.

 Rule 361 was adopted by the Board in 1993 and amended in 2003. On October 24, 2011 (after the formation of CAMRC), the Board amended Rule 361 again and renumbered it "Rule 361.1." The parties refer to Rule 361 and Rule 361.1 interchangeably. Because there are no differences that are material to this case, and because Rule 361 was in effect at the time that CAMRC was formed, we cite to Rule 361 in this opinion. A full copy of Rule 361 as it appears in the record is attached to this opinion as Appendix A.

 When Steinhilber was asked if it was correct that, "in the Board's rule, it tells you that when you do curriculum revisions, you are to follow the process in the handbook," he responded, "I would agree with that."

 "From a practical standpoint," Steinhilber explained, the Board "acknowledg[ed] that we have developed a handbook, and that we adjust the processes we feel [are] appropriate. We also determine, you know, when that occurs, for which courses, what timelines, and we make recommendations then." But overall, he testified, the "process that we follow is that we set up a committee that reviews present curriculum, makes modi *248 fications, looks for materials, educational materials, that support that. We bring forward our recommendations to our Board, they review it, they determine what other changes they may want, and then they do Board approve [sic] that final product."

 The relevant portions of the Handbook as they appear in the record are attached to this opinion as Appendix B.

 For example, as Steinhilber testified in his deposition:
Q: CAMRC was a Review Committee operating under the ACI Handbook. You agree with that, right?
A: Ido.

 As Bunnow put it, "[Rule] 361.1 and the ACI Handbook is the process that we did follow because Superintendent *252 Allinger asked us to address the parent concerns." This is consistent with the Board's and CAMRC's discovery responses, which stated that "CAMRC was created pursuant to a modified 6-year curriculum cycle, a process which is enumerated in the ACI Handbook." The Board and CAMRC further explained that "CAMRC's purpose and tasks are clearly enumerated by the ACI Department, and ACI Department policy guided CAMRC through the modified curriculum process, as dictated by the ACI Department." Further, "CAMRC's membership was determined as set forth in the ACI Handbook."

 A person may not sue to enforce the open meetings law unless the person has first filed a verified complaint with the district attorney. See Journal Times v. City of Racine Bd. of Police and Fire Comm'rs, 2015 WI 56, ¶¶ 51-52, 362 Wis. 2d 577, 866 N.W.2d 563 (refusing to address an open meetings claim where the procedures for filing suit under the open meetings law were not followed). Only "[i]f the district attorney refuses or otherwise fails to commence an action to enforce this subchapter within 20 days after receiving a verified complaint" may the person "bring an action ... on his or her relation in the name, and on behalf, of the state." Wis. Stat. § 19.97(4). Here, it is not disputed that Krueger properly filed a verified complaint with the Outagamie County district attorney at least 20 days before commencing this action in the name of the State.

 The rest of the definition, which we need not address in this case, provides that "governmental body" also includes "a governmental or quasi-governmental corporation except for the Bradley center sports and entertainment corporation; a local exposition district under subch. II of ch. 229; [or] a long-term care district under s. 46.2895." Wis. Stat. § 19.82(1). It also "excludes any such body or committee or subunit of such body which is formed for or meeting for the purpose of collective bargaining under subch. I, IV, or V of ch. 111." Id.
We also note that some entities that fit the statutory definition nevertheless may be exempt from the open meetings law for constitutional reasons. See State ex rel. Lynch v. Dancey, 71 Wis. 2d 287, 295-96, 238 N.W.2d 81 (1976) (holding that the supreme court's superintending authority over the judicial system preempted the application of the open meetings law to a body created by and under the authority of the court).

 "In the absence of some other indication, the modifier reaches the entire enumeration." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (citing Ward Gen. Ins. Servs. v. Employers Fire Ins., 7 Cal. Rptr. 3d 844, 849 (Ct. App. 2003) ("Most readers expect the first adjective in a series of nouns or phrases to modify each noun or phrase in the following series unless another adjective appears.")).

 "The opinions of the Attorney General are not binding on the courts but may be given persuasive effect." Milwaukee Journal Sentinel v. City of Milwaukee, 2012 WI 65, ¶ 41, 341 Wis. 2d 607, 815 N.W.2d 367. Opinions of the Attorney General interpreting the public records and open meetings laws have "special significance .. . inasmuch as the legislature has specifically authorized the Attorney General to advise any person about the applicability of the Law." Id.; see Wis. Stat. § 19.98 ("Any person may request advice from the attorney general as to the applicability of this subchapter under any circumstances.")

 "Resort to definitions, statutory or dictionary, is appropriate for the purpose of determining meaning that is plain on the face of the statute." State ex rel. Girouard v. Cir. Ct. for Jackson Cty., 155 Wis. 2d 148, 156, 454 N.W.2d 792 (1990).

 Our recognition that the term "rule" in Wis. Stat. § 19.82(1) should be given a common, ordinary, and accepted meaning is not inconsistent with the Attorney General's interpretation of the term "order" in § 19.82(1), which also is derived from a common dictionary definition. See 78 Wis. Op. Att'y Gen. 67, 68-69 (1989) (OAG 13-89) (defining "order" to include "an authoritative mandate usufally] from a superior to a subordinate" and explaining that "[n]either the statute nor the dictionary definition require that the order be formal. All that is required to create a governmental body is a directive creating the body and assigning it duties.")